595 A.2d 28

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Arthur FAULKNER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1990.

Decided July 16, 1991.

62

64

Robert A. Selig, West Conshohocken, for appellant.

Michael D. Marino, Dist. Atty., Mary MacNeill Killinger, Asst. Dist. Atty., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is an automatic direct appeal [1] from two sentences of death imposed upon appellant by the Court of Common Pleas of Montgomery County following his conviction of two counts of first degree murder, rape, involuntary deviate sexual intercourse, two counts of attempted murder, criminal intent and possession of instruments of crime. For the reasons that follow, we affirm the judgment of sentence of death.

Following a trial by jury, Arthur Faulkner was found guilty of the above listed crimes. A separate penalty hearing was held to determine whether the death penalty should be imposed for either or both of the first degree murder convictions. With respect to the murders of Clarice Dorner and Annaliese Killoran, the jury unanimously found that in each instance there were one or more aggravating circumstances which outweighed any mitigating circumstance and thus fixed the penalty at death for both murders. [2]

The appellant filed a motion for a new trial and/or an arrest of judgment, which was denied. On June 5, 1989, the appellant was sentenced to death by electrocution for each of the two counts of first degree murder, concurrent sentences of ten to twenty years for the rape crimes and

1. See 42 Pa.C.S.A. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b).

2. In the Dorner murder, the jury found two aggravating circumstances; first, that appellant committed the killing while in the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)) and second, that appellant was convicted of another offense which occurred at the time of the offense in issue for which a life sentence or death was imposable (42 P.A.C.S. § 9711(d)(10)). The jury referred to this second aggravating circumstance as "multiple murder." In the Dorner murder, the jury found "a degree of mental illness" as the sole mitigating circumstance. In the Killoran murder, the jury found "multiple murder" as the only aggravating circumstance and "a degree of mental illness" as the sole mitigating circumstance.

concurrent sentences of five to ten years for the crimes of attempted homicide. A petition for reconsideration of sentence was denied.

 In cases in which the death penalty is imposed, this Court is required to conduct an independent review of the sufficiency of the evidence, even where the defendant has not challenged the conviction on that ground. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981). So viewed, the evidence establishes the following.

## FACTUAL HISTORY

 Arthur Faulkner was hired by SJS Archeological Services as a laborer in November of 1987. SJS was a small archeological excavating company owned by Anne Jensen and Glenn Sheehan (husband and wife), which employed approximately ten to fifteen people, including the victims Clarice Dorner and Annaliese Killoran.

On April 1, 1988, Good Friday, Ms. Dorner, Ms. Killoran and Mr. Faulkner were planning to work at the laboratory of SJS at 10 Woodmont Road in Lower Merion Township, Pennsylvania. 10 Woodmont Road was a rowhouse in which the SJS laboratory was located. Mr. Sheehan and Ms. Jensen resided at 3 Woodmont Road, just down the street. Mr. Sheehan and Ms. Jensen had returned home from breakfast sometime before 10:00 a.m. and were planning to go to an 11:00 a.m. appointment before attending Good Friday church services. Ms. Jensen testified that she walked up the street to the office to see if the employees had enough work to carry them through the day.

Ms. Jensen walked into the office building, saw Mr. Faulkner coming down the stairs and moved to get out of his way. As she turned to go up the stairs, she was grabbed from behind by Faulkner. He put his left arm around her neck, held a knife to her chest and forced her to the second floor of the building. Faulkner stated "Why didn't you and Glenn tell those bitches to give me some pussy?" Ms. Jensen tried to calm him down and told him that she was pregnant and that he did not want to do this. He replied, "it can't get any worse, one person is dead already." When Ms. Jensen tried to convince him that maybe the person was not really dead and again reminded him that she was pregnant, Faulkner replied "I don't want to hear that shit." Ms. Jensen noticed that the room on the second floor was in disarray and that there was blood all over the room and water all over the floor.

At that time, Ms. Jensen saw another employee, Annaliese Killoran, coming up the stairs and screamed to her to get away and get help, telling her that Faulkner had a knife. As Ms. Killoran turned back down the stairs to run away, Faulkner stabbed Ms. Jensen in the back several times, threw her down and ran down the stairs and out the door in pursuit of Ms. Killoran. Ms. Jensen held her hand over the wound sites as best she could and headed back down the stairs, looking for help.

She headed outside and in the direction of her home when she saw Faulkner repeatedly stabbing Ms. Killoran who was lying on her side in a fetal position in front of the office building. Ms. Jensen ran between two of the row houses and realized that Faulkner was chasing her. In order to escape from him, she jumped off a ten-to-fifteen foot wall onto an abandoned road, known as Old River Road. She yelled to two men standing outside a pickup truck that she was pregnant and had been stabbed and asked that they get help. The two men got into the truck and drove away. She turned and saw Mr. Faulkner trying to gain access to River Road through a gate. She kept running the other way. When she turned back to the gate, she saw that Faulkner

had turned and headed back toward the houses. She eventually collapsed on River Road, but worried that she would bleed to death and unable to walk, she began to roll down the road. She was eventually found and taken to the hospital.

While Mr. Sheehan was at home talking on the telephone, he heard a scream that he believed sounded like his wife. He dropped the telephone and ran out of the house, where he encountered Ms. Killoran lying on a concrete patio. She had been stabbed and there was a pool of blood under her head. As Mr. Sheehan was telling her he was going to get help, Mr. Faulkner surprised him and grabbed him in a bear hug and began stabbing him. Faulkner kept repeating that "he had to get the keys." Mr. Sheehan broke away and ran off, looking for help. As he was running away, he noticed Faulkner bending over Ms. Killoran. Mr. Sheehan opened the door to one of the houses and yelled for help. He told them to call the police and an ambulance and said that he could not find his wife, who was pregnant. He then went up the street to a construction site and asked people at the site if they would move their vehicles to block the road so that Faulkner could not escape.

Before the police arrived, Faulkner had left the scene in a truck owned by Ms. Killoran. One of the people at the construction site saw a large black man getting into a truck and driving away. A neighbor had his camera and took photographs of the truck leaving the scene. According to documents later discovered, the appellant went to his bank terminal and withdrew the maximum allowable daily limit of three hundred dollars. Faulkner then went home and changed his bloody clothes. He was apprehended nine days later when a New York City policeman saw Faulkner sitting in Ms. Killoran's vehicle. He was arrested and later gave a statement to the police in which he admitted having sex with Ms. Dorner and stabbing her and the other victims.

During trial, the police testified that they secured the building at 10 Woodmont Road and discovered the body of a white female, who was subsequently determined to be Clar-

ice Dorner. She was found naked from the waist down, lying on the floor, with blood covering parts of her body. There were numerous stab marks on her body, including her chest, abdomen and right hand. The police also found a rope tied to the back of the chair in the room in which the victim was discovered. During the trial, none of the SJS employees recalled ever seeing a rope in the offices before the murders. Semen consistent with Faulkner's was discovered on the chair.

The pathologist testified that the causes of Ms. Dorner's death were multiple stab wounds, blunt impact to the head, and manual strangulation. Additional testimony established that semen was discovered in her oral cavity. There was testimony that the knife found on appellant was capable of making such wounds. The same pathologist examined the body of Ms. Killoran and determined that the cause of death was multiple stab wounds.

The physician who treated Ms. Jensen at the hospital after the incident testified that she arrived in a state of shock, requiring blood transfusions and chest intubation in order to save her life and the life of her twenty-week old fetus. Both she and her child survived.

Mr. Sheehan's treating physician testified that Mr. Sheehan presented at the hospital with multiple wounds consistent with being stabbed by a knife. Certain of these stabs wounds punctured his lung, collapsing it. At the time of his admission to the hospital, he was in a life-threatening condition and was required to undergo chest intubation as well as surgery to save his life.

It is beyond question that there was sufficient evidence to support appellant's convictions for two counts of first degree murder, rape, deviate sexual intercourse and attempted homicide. In fact, appellant does not challenge the sufficiency of the evidence of his conviction. Having resolved that matter, we move to appellant's particular claims of error.

Appellant's main claims of error involve the refusal of the trial judge to permit him to introduce expert psychiatric testimony during the guilt phase—as opposed to the penalty phase—of the trial. For the reasons that follow, we find these arguments unpersuasive.

Prior to the trial of this matter, appellant filed a motion to retain psychiatric experts. Appellant chose two experts, Dr. Robert Sadoff, a psychiatrist, and Dr. Gerald Cooke, a psychologist. Since appellant would not consent to be examined by a Commonwealth psychiatrist, the trial court required appellant to reduce the opinions of the experts to writings and provide them to the court and the prosecutor.

On the morning of trial, the prosecutor filed a motion *in limine* to preclude the testimony of appellant's experts during the guilt phase of the trial. The trial judge agreed, finding that the opinions of the experts established neither that appellant was "M'Naghten insane"[3] nor suffered from diminished capacity[4]; psychiatric defenses which would permit a jury to find the defendant either not guilty or guilty of a lesser degree of homicide than first degree murder.[5] Rather, the trial judge found that these

3. Legal insanity—the M'Naghten rule—is defined by statute as follows: At the time of the commission of the act, the defendant was laboring under such defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong. 18 Pa.C.S. § 314(c)(2).

4. In *Commonwealth v. Walzack*, 468 Pa. 210, 220, 360 A.2d 914, 919–20 (1976), we described the diminished capacity defense as follows: "An accused offering evidence under the theory of diminished capacity *concedes general criminal liability*. The thrust of this doctrine is to challenge the capacity of the actor to possess a particular state of mind required by the legislature for the commission of a certain degree of the crime charged." Thus, in a first degree murder in which the defendant offers the defense of diminished capacity, he is attempting to prove that he was incapable of forming the specific intent to kill, a requirement of first degree murder.

5. We note that there is no allegation that these murders were committed in the heat of passion—another instance when we permit psychiatric testimony to reduce the degree of homicide, *Commonwealth v. McCusker*, 448 Pa. 382, 392–93, 292 A.2d 286, 291 (1972)—nor is there any allegation that the appellant was so intoxicated as to reduce the

reports would only permit the jury to find appellant "guilty, but mentally ill;" a designation that would not affect a jury's verdict of guilt.[6]

The ruling of the trial court was correct. This Court has never allowed the type of testimony the defendant proposed to be introduced during the guilt phase of a first degree murder case. Testimony from psychiatric experts is relevant if it can establish that the defendant was insane under the "M'Naghten" standard, *Commonwealth v. Reilly*, 519 Pa. 550, 549 A.2d 503 (1988) or "to negate specific intent to commit first degree murder." *Commonwealth v. Garcia*, 505 Pa. 304, 311, 479 A.2d 473, 476 (1984).

The proposed testimony of the experts would have established that Faulkner may have believed that he engaged in consensual sex with the victim, Annaliese Killoran, and was being set up by his co-workers to look as if he had raped her. He allegedly also believed that he was going to be killed by his co-workers. Both psychiatric experts stated in their reports that Faulkner was probably psychotic and may have been delusional at the time of the events in question. However, Dr. Sadoff stated that "the evidence indicates that he knew the nature and quality of his acts and knew that what he was doing was wrong...." The other expert, Dr. Cooke, stated that "the details of the offense indicate that he was aware of the nature and quality of his behavior."

crime of murder from first degree. *See Commonwealth v. Ingram*, 440 Pa. 239, 270 A.2d 190 (1970).

6. "Guilty but Mentally Ill" is a statutorily created provision in which a person who offers an insanity defense may be found "guilty but mentally ill." "Mentally ill" is defined as: "One who as a result of a mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." 18 Pa.C.S. § 314(c)(1). A defendant who is found guilty but mentally ill "may have any sentence imposed on him which may lawfully be imposed on any defendant convicted of the same offense." 42 Pa.C.S. § 9729(a). In a death penalty case, evidence that does not rise to the level of a recognized defense or mitigation of first degree murder is only admissible in the penalty phase. *See, Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990), discussed *infra*.

Thus, it is clear that this testimony was not relevant to a determination of whether the appellant was "M'Naghten insane" and was properly excluded by the trial judge.

Dr. Sadoff's report also states that Faulkner "had the ability to form specific intents at the time, so there is no indication that he would have a diminished capacity to form the specific intent." Dr. Cooke's report stated "[h]e also clearly formed various intents and acted upon them." This testimony unequivocally indicates that Faulkner was unable to claim that the expert testimony was relevant to the issue of diminished capacity and it was therefore properly excluded on that ground. *See, Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976).

Appellant argues that it was improper for the trial judge to disallow the proposed expert testimony since it would have permitted the jury to find appellant "guilty but mentally ill." Both experts stated in their opinions that Faulkner was unable to "conform his conduct to the requirements of law," evidence that would tend to show the defendant was guilty but mentally ill.

Appellant's argument that the testimony was relevant during the guilt phase of the trial is erroneous. In a capital case, evidence tending to show a defendant was "guilty but mentally ill" is properly admitted only at the penalty phase—not the guilt phase. In *Commonwealth v. Young,* 524 Pa. 373, 572 A.2d 1217 (1990), we stated:

> In the usual situation the judge is entrusted with determining the appropriate sentence, and the jury's function is confined to determining the guilt of the accused. The verdict providing for "guilty but mentally ill" represents an exception to this general rule. By rendering this judgment, the jury is permitted to advise the sentencing judge to consider the fact of mental illness in the exercise of his sentencing decision. Capital cases are unique in that the jury and not the judge sets the penalty in such cases. The consideration of a possible verdict of guilty but mentally ill is a matter that would appropriately be rendered by a jury in a capital case during the sentencing

phase as opposed to the guilty [sic] phase. We permit the jury to rule upon this penological concern during the guilt phase in all other cases simply because they have no opportunity for input in the sentencing phase. That consideration is not present in capital cases.

*Id.*, 524 Pa. at 393, 572 A.2d at 1227.[7] In light of this holding, appellant's argument that the psychiatric testimony was relevant during the guilt phase of his trial has no merit.

Appellant also argues that it was error for the court to refuse to appoint additional psychiatric experts. The appellant was unable to articulate any reasons why he required additional experts, although he obviously hoped to find a psychiatrist or psychologist to state that he was either insane or unable to form the specific intent necessary to support a finding of first degree murder. However, appellant fails to appreciate that he chose his own experts. A defendant is not entitled to unlimited court appointed experts until he finds one that renders the opinion he desires. As such, we are unpersuaded by this argument.

Appellant correlatively argues that it was error for the court to order appellant to turn over to the prosecution the experts' reports before trial, without requiring the prosecution to engage in reciprocal discovery. For two reasons, this argument fails. First, appellant refused to be examined by the prosecution's psychiatric expert prior to trial. As such, the prosecution did not *have* any reciprocal discovery to turn over to the appellant. Second, Rule 305(C)(2) of the Pa.R.Crim.P. provides that:

7. Although this Court has stated that "guilty but mentally ill" is relevant only in the penalty phase of a capital case, it is clear that the jury has already found the defendant guilty by the time the penalty phase occurs. What this Court is referring to by use of the phrase "guilty but mentally ill" are the mitigating circumstances concerning mental illness that are available to a defendant in a capital case. These mitigating circumstances include: 42 Pa.C.S. § 9711(e)(2) The defendant was under the influence of extreme mental or emotional disturbance; and § 9711(e)(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

[I]f the Commonwealth files. a motion for pretrial discovery, the court may order the defendant ... to allow the ... Commonwealth to inspect and copy ... upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable: (a) results or reports of physical or mental examinations ... which the defendant intends to introduce as evidence in chief, or which were prepared by a witness who the defendant intends to call at the trial....

██ Appellant has made no argument establishing that the trial judge abused his discretion in ordering him to turn over the pretrial reports of his expert witnesses. Rather, given the facts of this case, the trial judge's rulings were reasonable. *See, Commonwealth v. Logan,* 519 Pa. 607, 549 A.2d 531 (1988). Furthermore, this case is factually distinct from *Commonwealth v. Frisoli,* 277 Pa.Super. 396, 419 A.2d 1204 (1980), on which appellant relies. In *Frisoli,* the Government sought the defendant's psychiatric reports, which the court refused to order. However, in that case, the trial court directed Friscoli to submit to a psychiatric examination (which he did) so the Commonwealth might determine for itself the defendant's mental condition. Thus, there was no pressing need for the prosecution to review the psychiatric reports of the defendant's experts. In the instant case, appellant refused to submit to a psychiatric examination and the prosecutor had a much stronger need to know the substance of the psychiatric experts testimony. As such, we do not find that the trial court abused its discretion in ordering appellant to turn over to the Commonwealth its reports of Dr. Cooke and Dr. Sadoff.

██ Appellant also argues that it was improper to permit the Commonwealth's expert, Dr. Timothy Michals, to testify during the penalty phase of the trial. Appellant argues that "Dr. Michals' testimony could have been presented by the Commonwealth in its case in chief in light of the fact that the Commonwealth had been heretofore supplied with a copy of the reports of Drs. Cooke and Sadoff." This argument is meritless. Drs. Cooke and

Sadoff testified during the penalty phase. Since appellant refused to be examined by a Commonwealth psychiatric expert, the court permitted Dr. Michals to listen to their testimony and then testify on rebuttal. It is difficult to even ascertain the essence of appellant's argument. That Dr. Michals could have testified in the guilt phase (to which appellant would have objected), does not mean that he was precluded from testifying as a rebuttal witness during the penalty phase. Furthermore, we note that during the penalty phase the jury found as a mitigating circumstance that appellant suffered from a degree of mental illness. Thus, he cannot establish any harm resulted from permitting Dr. Michals to testify as a rebuttal witness.

 Faulkner also claims it was error for the trial judge to refuse to instruct the jury on a "guilty but mentally ill" verdict and the diminished capacity defense. Since there was no evidence introduced by appellant during the guilt phase with respect to either of these issues, it was not error for the court to refuse to give the requested instructions.

 Appellant's last argument on this subject is that the death penalty statute violates the Eighth Amendment to the United States Constitution by permitting the jury to impose the death penalty when they have found, as a mitigating circumstance, that the defendant was mentally ill. Appellant argues that an automatic life sentence should be imposed—and not the death penalty—when the jury finds mental illness as a mitigating circumstance. In *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986), this Court stated that a finding of substantial mental impairment under 42 Pa.C.S. § 9711(e)(3) does not bar a death penalty imposed by the jury:

> Our legislature could have provided that a finding of substantial impairment precludes imposition of the death sentence, however, it did not do so. Instead, it determined that this factor was to be weighed by the jury along with all the other factors and that it is within the province of the jury to determine how much weight it should be accorded.

*Fahy,* 512 Pa. at 317, 516 A.2d at 698–99. We believe this rationale is equally applicable when the jury finds as a mitigating factor that a defendant suffered from "a degree of mental illness."

■ Other than the mere allegation that this provision of the statute is unconstitutional, appellant advances no argument as to why he believes the statute is unconstitutional in this circumstance. We do not believe that the death penalty statute is unconstitutional for the reason advanced by appellant.

■ Appellant also claims that the charges against him should have been dismissed when the Montgomery District Attorney's office hired appellant's private investigator. In the alternative, appellant claims that the District Attorney should have been disqualified from the case.

On June 30, 1988, counsel for appellant retained the services of Walter T. Zdunowsky, Jr. as an investigator on behalf of appellant. Zdunowsky was involved in the preparation of the defense and met with appellant on several occasions, discussing the case. Zdunowsky interviewed prospective witnesses and reviewed strategy with appellant's counsel.

On August 30, 1988, Zdunowsky informed counsel for appellant that he had been offered a job as a county detective, working for the Montgomery District Attorney's office. The new position was scheduled to begin in October, 1988.

Appellant filed a motion to disqualify the District Attorney of Montgomery County on the basis of an appearance of impropriety and a conflict of interest. At the hearing on the motion, Mr. Zdunowsky testified that there had been no communication between him and the District Attorney's office. The Judge denied the motion to disqualify.

Although appellant claims that there was a conflict of interest and the appearance of impropriety, he does not articulate how he suffered any prejudice as a result of Zdunowsky going to work for the District Attorney's office.

There is no claim that Zdunowsky actually discussed appellant's case with anyone in the District Attorney's office or engaged in any improper behavior. As such, we fail to see how appellant was prejudiced by Zdunowsky's actions. As is well accepted, in order to prevail on a conflict of interest claim, appellant must show actual prejudice. See, *Commonwealth v. Dunlap*, 233 Pa.Super. 38, 335 A.2d 364 (1975), *aff'd* 474 Pa. 155, 377 A.2d 975 (1977). As appellant has shown no prejudice, his argument is without merit.

Appellant next argues that the District Attorney was guilty of prosecutorial misconduct when he made certain prejudicial statements during the trial. Specifically, appellant claims that during defense counsel's cross examination, the District Attorney called defense counsel "stupid." Shortly thereafter, the District Attorney stated "Your Honor, this is outrageous what he is attempting to do with an envelope." The District Attorney was referring to a document being used by defense counsel. "Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial." *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973). Rather, the focus is on what, if any, effects the comments had on the jury. A new trial is required when the effect of the District Attorney's comments "would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Van Cliff*, 483 Pa. 576, 582, 397 A.2d 1173, 1176 (1979), *cert. denied*, 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979), quoting *Commonwealth v. McNeal*, 456 Pa. 394, 400, 319 A.2d 669, 673 (1974). Further, this decision is for the trial court to make. Our role is to determine solely whether the trial court abused its discretion. *Van Cliff*, 483 Pa. at 582, 397 A.2d at 1176. We do not believe that the trial judge abused his discretion in determining that the comments of the prosecutor did not prejudice the jury.

██ Appellant also claims that he was denied a fair trial by the prosecution's use of photographs of Annaliese Killoran and Clarice Dorner. The black and white photographs to which appellant objects depict the scene of the incident and the state in which the bodies of Ms. Killoran and Ms. Dorner were discovered. The prosecution states that these photographs were the best evidence of the specific injuries and the setting of the crime. Appellant claims that the photographs were gruesome and admitted solely to inflame the passions of the jury. He further claims that there was no evidentiary necessity to admit these photographs as there was ample testimony explaining the injuries of the victims. "The admission into evidence of photographs depicting the corpse of the homicide victim or the location and scene of the crime lies within the sound discretion of the trial judge." *Commonwealth v. Garcia*, 505 Pa. 304, 313, 479 A.2d 473, 478 (1984). *See also, Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987).

While the photographs are graphic in their representation, we do not believe that they were so inflammatory as to require their exclusion. Furthermore, the trial court appropriately cautioned the jury that the photographs were not meant to be inflammatory or to appeal to their passions, but rather were being introduced for explanatory purposes. We do not find that the trial judge abused his discretion in permitting them to be seen by the jury.

██ Appellant argues alternatively that even if the photographs were properly exhibited to the jury during testimony, they should not have been sent out with the jury during deliberation. Appellant advances no argument to support a claim that the trial judge abused his discretion in permitting the jury to view the photographs during deliberation, and we find no error in his decision.[8]

---

**8.** Appellant also complains that the curative instruction given by the judge at the time the photographs were admitted did not comply with the "language contained in *Commonwealth v. Garcia,* 505 Pa. 304, 479 A.2d 473." We are not certain to what language appellant is referring in the *Garcia* case, but we believe that the lengthy instruction of the court was more than sufficient.

The next claim of error concerns the trial judge's recharging the jury on first degree murder. During the guilt phase of the trial, the jury submitted a question to the court requesting a redefinition of the term "premeditated." The trial judge recharged the jury on the elements of first degree murder, including premeditation. When appellant complained at trial about charging on all elements, the trial judge stated that it would not make sense to instruct on premeditation out of context. Appellant alleges that this recharging was not responsive to the jury's question, and placed undue emphasis on that crime.

The trial judge has broad discretion in phrasing points for charge and is not bound to give instructions in the form requested. *Commonwealth v. Ohle*, 503 Pa. 566, 582, 470 A.2d 61, 70 (1983), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). *See also, Commonwealth v. McComb*, 462 Pa. 504, 341 A.2d 496 (1975). Evidently, the trial judge believed that premeditation would be understood most clearly in the context of the charge encompassing first degree murder. An appellate court's evaluation of the charge must be based on an examination of the charge as a whole to determine whether it was fair or prejudicial. *Commonwealth v. Wortham*, 471 Pa. 243, 369 A.2d 1287 (1977). Because we believe that the court did not abuse its discretion, we do not find that this claim has merit.

Appellant also argues that it was error to admit certain letters that he wrote. The Commonwealth introduced letters written by appellant to the bank a few months after the incident forming the basis for this case. In those letters, appellant inquired about his bank balance and other matters concerning his account. The prosecution introduced these letters to show that appellant possessed the requisite mental state necessary to each of the crimes charged.

Faulkner contends that the information was irrelevant and that the evidence deprived him of a fair trial, in light of

the fact that he was not permitted to introduce any psychiatric evidence concerning his mental state.

We believe that these documents were relevant to show that the appellant possessed the requisite mental state necessary to support specific intent to kill and premeditation; necessary elements of the crimes with which he was charged and which the prosecution was required to prove. Even if we were persuaded that the documents were irrelevant, we cannot perceive how they prejudiced the appellant. In light of the overwhelming evidence of his guilt, any possible error would thus be deemed harmless.[9]

■■ Appellant next argues that he is entitled to a new trial as a result of the failure of the jurors to be contrite during voir dire. Faulkner points to the following quote in the newspaper that an anonymous juror made: "My own personal opinion was that I believed he was guilty from the start and he decided to die.... Anyone that's gonna kill two women and rape them deserved to die." Faulkner claims that this statement indicates that one of the jurors perjured himself during the voir dire. We reach no such conclusion. This statement is just as easily interpreted as a statement of belief *after* the juror heard the evidence. We reject this claim as being meritless. *See Commonwealth v. Tressler*, 526 Pa. 139, 584 A.2d 930 (1990).

■■■ Appellant makes the correlative argument that he was denied a fair trial by the failure of the trial court to grant his motion for a change of venue. Faulkner claims that the pretrial publicity in the media was "sustained, pervasive, inflammatory and inculpatory." Faulkner fails, however, to inform this Court of the substance of the media coverage which forms the basis for his claim of error. Additionally, he fails to cite one article, newspaper report, or broadcast to support this assertion. He also fails to explain how he was prejudiced as a result of the coverage.

9. We have defined harmless error as follows. "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict." *Commonwealth v. Story*, 476 Pa. 391, 409, 383 A.2d 155, 164 (1978).

In fact, he only requotes the statement of the anonymous juror cited above—a statement made *after* the case was completed.

We are not persuaded that the judge's decision to deny the motion for a change of venue was error. "The grant or denial of a change of venue is a matter within the sound discretion of the trial court, and its exercise will not be disturbed by an appellate court in the absence of an abuse of discretion." *Commonwealth v. Buehl,* 510 Pa. 363, 375–76, 508 A.2d 1167, 1173 (1986), *cert. denied,* 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988). Furthermore, a defendant must demonstrate that the pre-trial publicity resulted in actual prejudice in the empaneling of the jury in order to succeed on this claim. *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982), *cert. denied,* 460 U.S. 1043, 103 S.Ct. 1440, 75 L.Ed.2d 797 (1983).

We do not believe that appellant has made any showing that either the trial judge abused his discretion or that appellant was prejudiced by any pretrial publicity. This conclusion is inescapable in light of appellant's failure to set forth what publicity was harmful and what prejudice he suffered as a result. Additionally, his failure to point to any specific coverage or any specific juror that was biased bolsters this conclusion. For these reasons, we reject this claim of error.[10]

The final allegation of error involves the trial court's refusal to suppress the testimony of a police officer who had destroyed his notes of an interview. Apparently, Detective Metz interviewed appellant after he was arrested in New York City. The detective made notes of the interview, but did not use the tape recorder he had with him. After the interview, Metz prepared a report and destroyed the notes. Appellant claims that there may have been favorable material in those notes, and thus, his constitutional

10. We have carefully reviewed all the transcripts of the voir dire of the jury panel and find that no juror chosen had any discernable bias as a result of media coverage.

rights were violated in light of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 Appellant misperceives the essence of *Brady.* Once defense counsel has made a request for so-called *"Brady* material," which is exculpatory evidence, the prosecution is under an obligation to produce all such material responsive to the request to an accused. Here, there was nothing to produce. As such, this matter is not properly characterized as a *Brady* issue. Furthermore, absent a showing of suppression of material evidence by the prosecution—which appellant has not alleged—suppression of that evidence is not an appropriate remedy. *See, Commonwealth v. Giles,* 500 Pa. 413, 456 A.2d 1356 (1983). Like the *Giles* scenario, the prosecution in the case before us "never even had an opportunity to see [the notes], much less suppress [them]." *Id.,* 500 Pa. at 420, 456 A.2d at 1360. We are thus unpersuaded by this argument.

 Pursuant to our statutory duty to review death penalty cases to determine whether the sentence imposed is excessive or disproportionate to the penalty imposed in similar cases,[11] we have reviewed the data and information complied by the Administrative Office of the Pennsylvania Courts (AOPC) pertaining to similar cases.. *See, Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). We conclude therefrom that the sentences of death are not excessive or disproportionate to the penalty imposed in similar cases. We also find that the evidence supports the jury's finding of two of the aggravating circumstances specified in subsection (d), 42 Pa.C.S. § 9711(h)(3)(i), in the death of Clarice Dorner and one of the aggravating circumstances in the death of Annaliese Killoran. We are satisfied that the sentences imposed were not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i).

11. 42 Pa.C.S. § 9711(h)(3)(iii).

For the foregoing reasons, we uphold the convictions and affirm the judgment of sentence of death.[12]

McDERMOTT, J., did not participate in the consideration or decision of this case.

**12.** The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).