2023 PA Super 158

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LANCELOT FORTUNE | : | |
| | : | |
| Appellant | : | No. 2687 EDA 2022 |

Appeal from the Judgment of Sentence Entered September 29, 2022
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0000495-2018

BEFORE:   PANELLA, P.J., DUBOW, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED AUGUST 29, 2023**

Appellant Lancelot Fortune appeals from the judgment of sentence entered by the Court of Common Pleas of Monroe County after a jury convicted Appellant of two counts of first-degree murder and one count of tampering with/fabricating evidence. Appellant claims the trial court erred in precluding him from offering an insanity defense and in denying the public defender's request to withdraw due to an alleged conflict of interest. We affirm.

The trial court summarized the factual background of this case:

> On January 15, 2018, Pocono Township Police Department officers were dispatched to conduct a welfare call at a residence located at 145 Marcelle Terrace, Pocono Township. Upon arrival, officers discovered one deceased male, identified as Richard B. Fells, in the garage and one deceased female, identified as Sharon Fortune Fells (hereinafter "Victims"), inside the residence on a couch. Both Victims appeared to have suffered multiple stab wounds.

---

[*] Former Justice specially assigned to the Superior Court.

Upon speaking with the Victim's daughter, Selina Taylor, officers learned that [Appellant] lived at the Victims' residence on-and-off for years. Taylor stated that [Appellant] had not lived at the residence for approximately one year, but still frequented the residence. In addition, Taylor stated that [Appellant] resided at 814 Sarah Street in Stroudsburg.

On January 15, 2018, a search warrant was executed at 145 Marcelle Terrace and the curtilage. Passive blood drops were observed throughout the first floor of the residence. In addition, several kitchen knives with apparent blood transfer on them were observed on the kitchen counter. Further, bloody shoe print impressions were observed on the garage floor leading away from the male victim. Finally, on a piece of board located on the stairway leading to the house from the garage, a fingerprint in apparent dried blood was recovered. That same day, the fingerprint was preliminarily identified as matching the right middle finger of [Appellant].

Following the fingerprint identification, officers went to [Appellant's] residence at 814 Sarah Street and encountered [Appellant], who presented with several small scratches on his face. A search warrant was executed on [Appellant's] residence and uncovered blood on the interior of the entrance, a bloody shirt from the bedroom, and a pair of black sneakers containing a tread pattern consistent with those observed in the Victims' garage. As a result, [Appellant] was detained and transported to the PSP Stroudsburg barracks.

While in custody, [Appellant] was provided a ***Miranda*** Rights Warning and Waiver. [Appellant] waived his ***Miranda*** rights and related that he had stabbed Sharon Fortune Fells multiple times in the throat while she rested on the living room couch. In addition, [Appellant] related that he knew Richard Fells would be returning shortly and waited in hiding behind the door leading to the garage. Upon Richard Fells' return, [Appellant] related that he stabbed the Victim multiple times in the neck and body.

After killing the Victims, [Appellant] admitted to taking the Victims' Lincoln Navigator and leaving the scene. [Appellant] related that he drove to his apartment, changed clothes, then drove to the Philadelphia area where he watched the movie Jumanji at a movie theater in King of Prussia and stayed overnight at a hotel. In addition, [Appellant] related that he threw the

- 2 -

murder weapon into the river at Penn's Landing and discarded clothing in the surrounding area. Following this trip to the Philadelphia area, [Appellant] returned to the scene, left the Victims' vehicle in the driveway, and returned to his apartment.

Trial Court Opinion (T.C.O.), 11/14/22, at 2-3.

Appellant was charged with the aforementioned offenses in connection with the Victims' deaths. Thereafter, Appellant submitted to competency evaluations by both parties. On November 20, 2018, the trial court held a hearing pursuant to the Mental Health Procedures Act ("MHPA") at which it found Appellant was incompetent to stand trial. The trial court cited to the expert report of Dr. Robert Morrow, M.D., who diagnosed Appellant with paranoid schizophrenia and indicated that Appellant "continues to be grossly psychotic." Order, 11/20/18, at 1. Based on Dr. Morrow's recommendation, the trial court directed that Appellant be committed to a state hospital. Further, the trial court ordered that all proceedings be stayed as long as Appellant's incompetency persisted.

Nearly one year later, on September 4, 2019, at a subsequent MHPA hearing, the trial court determined that Appellant had regained competency to stand trial. The trial court based its decision on the testimony of Dr. William Hoctor, Jr., M.D., who attributed the improvement to Appellant's consistent treatment and medication. Appellant was transferred to the Monroe County Correctional Facility.

Prior to trial, Appellant filed notice of his intent to seek an insanity defense pursuant to Pa.R.Crim.P. 568. Appellant provided that he would offer the expert testimony of Dr. Morrow, who would testify that Appellant suffered

- 3 -

from a mental disease, namely paranoid schizophrenia. In addition, Appellant indicated that he planned to call numerous lay witnesses to testify as to Appellant's general mental health and their observations of Appellant near the time of the Victims' murders.

On May 25, 2021, the Commonwealth filed a Motion *In Limine* to Preclude Insufficient Insanity Defense, emphasizing that Dr. Morrow authored an expert report indicating that while Appellant suffered from paranoid schizophrenia, Dr. Morrow opined that Appellant did not meet the legal standard for insanity as there was evidence showing that Appellant had volitional control over his actions and knew what he did was wrong.

On June 15, 2021, the trial court entered an order and opinion granting the Commonwealth's motion *in limine* and specifically providing that Appellant was "precluded from raising a defense of insanity at trial." Order, 6/15/21, at 1. The trial court concluded that Appellant could not, as a matter of law, establish an insanity defense without presenting expert testimony concluding that Appellant was legally insane.

Appellant proceeded to a jury trial at which he was convicted of two counts of first-degree murder and one count of tampering with/fabricating evidence. Thereafter, on September 29, 2022, Appellant was sentenced to life imprisonment without the possibility of parole. Appellant filed a timely notice of appeal and complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review:

> I.   Did the court commit an error of law in prohibiting [Appellant] to testify in order to establish the defense of insanity?
>
> II.  Did the court abuse its discretion by denying the Monroe County Public Defender's [Motion] to Withdraw from the case due to a conflict of interest?

Appellant's Brief at 4.

First, Appellant claims the trial court committed an error of law in precluding him from raising an insanity defense. Although Appellant concedes that his expert witness concluded that he was not legally insane, Appellant asserts that he should have been permitted to present an insanity defense for the jury's consideration based on the testimony of his expert and several lay witnesses as well as his own testimony.

To evaluate Appellant's specific argument, it is helpful to set forth the law applicable to an insanity defense. It is well-established that "criminal defendants may be presumed sane for purposes of determining their criminal liability." ***Commonwealth v. Rabold***, 951 A.2d 329, 341 (Pa. 2008) (quoting ***Clark v. Arizona***, 548 U.S. 735, 766 (2006)). As a result, a defendant has the burden of proving an insanity defense by a preponderance of the evidence. 18 Pa.C.S.A. § 315(a) ("[t]he mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense").

Section 315 of the Crimes Code contains the following definition of legal insanity:

**(b) Definition**.--For purposes of this section, the phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S.A. § 315. This definition of legal insanity (often referred to as the

"*M'Naghten* rule") is derived from the common law principle set forth in the

seminal case of *Regina v. M'Naghten*, 9 Eng.Rep. 718 (1843). *See Rabold*,

951 A.2d at 348 n.1.[1] Our courts have provided that:

> [t]o plead the defense of insanity suggests that the defendant committed the act, but was not legally culpable. *Commonwealth v. Mizell*, 493 Pa. 161, 164, 425 A.2d 424, 426 (1981). An insanity defense focuses upon a defendant's capacity, at the time of the offense, to understand the nature and quality of his actions or whether he knew that his actions were wrong. *Commonwealth v. Hughes*, 581 Pa. 274, 319 n. 29, 865 A.2d 761, 788 n. 29 (2004).

*Commonwealth v. Yasipour*, 957 A.2d 734, 738–39 (Pa.Super. 2008).

> Further, this Court has clarified that:

> The rule sets forth two separate and distinct aspects of the defense in Pennsylvania: a cognitive incapacity prong and a moral incapacity provision. Where the defendant alleges that he did not know what he was doing, he is presenting a cognitive incapacity insanity defense. On the other hand, if the defendant submits that he did not understand that what he was doing was wrong, he is advancing a moral incapacity defense.

*Commonwealth v. Andre*, 17 A.3d 951, 958–59 (Pa.Super. 2011).

---

[1] *See also* 18 Pa.C.S.A. § 314(d) ("Nothing in this section shall be deemed to repeal or otherwise abrogate the common law defense of insanity (M'Naghten's Rule) in effect in this Commonwealth on the effective date of this section").

Appellant claims the trial court should have allowed him to present an insanity defense through the testimony of his expert, Dr. Morrow, as well as multiple lay witnesses. Appellant desired to offer Dr. Morrow to testify to Appellant's schizophrenia diagnosis to establish that Appellant was laboring under a "disease of the mind" as set forth in Section 315.

Appellant also indicated that he intended to offer the testimony of numerous lay witnesses in support of his insanity defense. Appellant's proposed lay witnesses included five troopers who spoke with and observed Appellant on the day of his arrest, Appellant's father to testify as to the timeline of events that led up to the Appellant's diagnosis of schizophrenia as well as the Victims' murders, several family members to testify about their observations of Appellant three weeks prior to the Victim's murder, and a neighbor to testify that he observed Appellant three hours before the murder.

The Commonwealth has argued that Appellant is not entitled to raise an insanity defense as a matter of law as his expert witness, Dr. Morrow, opined that while Appellant suffers from paranoid schizophrenia, he does not meet the legal standard for insanity in light of the evidence of record. Dr. Morrow provided the following in his expert report:

> [Appellant's] past psychiatric history [is consistent] with a diagnosis of Paranoid Schizophrenia … As to whether [Appellant] might be considered criminally insane at the time of the alleged incident, I generally use the [*M'Naghten*] rule for assessment purposes. As the Court is aware, the [*M'Naghten*] rule states that a criminal defendant is not guilty by reason of insanity if at the time of the alleged criminal act, the defendant was so deranged that he did not know the nature or quality of his actions, or if he knew the nature and quality of his actions, he was so deranged

that he did not know what he was doing was wrong. There are multiple citations on the typed and recorded transcript indicating that [Appellant] knew his actions were wrong as evidenced by his hiding and disposing of the evidence of his crimes. And, although he was psychotic, he had some volitional control over his actions, as even though he admits murdering his aunt and uncle, he chose not to murder his father when he had the opportunity when he went to his house.

Addendum to Dr. Morrow's Psychiatric Evaluation, 2/17/20, at 4.

Therefore, Dr. Morrow made the following conclusions:

With regard to the extent to which [Appellant's] mental illness impacts on his degree of criminal responsibility, it is my psychiatric opinion that he does not meet all the criteria to justify rendering a verdict of not guilty by reason of insanity, which generally states that the person is not held responsible for his actions because the severity of his mental disorder rendered him incapable of distinguishing right from wrong … his actions following the alleged murders document that he had some awareness of the wrongfulness of his actions as he attempted to destroy or dispose of evidence of his acts, and had some volitional control over his actions at the time of the alleged criminal acts. I can state with a reasonable degree of medical and psychiatric certainty that at the time of the alleged murders, [Appellant] was in the throes of a severe paranoid delusional psychosis that diminished his ability to act in a rational and lawful manner. Therefore I believe it is appropriate to consider rendering a verdict of guilty but mentally ill.

Addendum to Dr. Morrow's Psychiatric Evaluation, 2/17/20, at 4.

The trial court found that the facts of this case presented an issue of first impression: "whether a defendant, may as a matter of law, offer an insanity defense where: (1) [the] defendant's sole mental health expert opines that the defendant suffered from a mental disease – here, schizophrenia – but concludes that the mental disease did not cause [the] defendant's inability to know what he was doing or judge its wrongfulness under **M'Naghten**; and

(2) [the] defendant seeks to establish the requisite causation between the diagnosed mental disease and his alleged inability to know what he was doing or judge its wrongfulness based solely on lay testimony." T.C.O. at 8-9.

Our Supreme Court has established that where a defense expert opines that the defendant suffers from a mental disease but determines that such mental disease did not cause the defendant to be unable to know the nature and quality of his actions or judge the wrongfulness of his actions, this expert testimony is not relevant to a determination of whether the defendant was legally insane. ***Commonwealth v. Faulkner***, 595 A.2d 28, 36 (Pa. 1991).

In that case, Faulkner filed a direct appeal to the Supreme Court from his two death sentences after a jury convicted him of two counts of first-degree murder and related offenses. Faulkner challenged the trial court's decision to grant the prosecution's motion *in limine* to preclude the testimony of defense experts, who opined that Faulkner "was probably psychotic" and "may have been delusional" at the time of his crimes, but concluded that Faulkner knew the nature and quality of his acts and knew what he was doing was wrong. ***Id.*** at 36. The trial court determined that this expert testimony was insufficient to establish that Faulkner was ***M'Naghten*** insane, but "would only permit the jury to find [Faulkner] 'guilty, but mentally ill;' a designation that would not affect a jury's verdict of guilt. ***Id.*** at 35.[2]

---

[2] "A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found 'guilty but mentally ill' at trial if the
*(Footnote Continued Next Page)*

On appeal, the Supreme Court affirmed the trial court's ruling, stating that "[t]estimony from psychiatric experts is relevant if it can establish that the defendant was insane under the **M'Naghten** standard … or to negate specific intent to commit first degree murder." **Id.** at 36. Given the defense experts had determined that Faulkner was aware of the nature and quality of his behavior and knew what he was doing was wrong, the Supreme Court concluded that the expert testimony "was not relevant to a determination of whether [Faulkner] was '**M'Naghten** insane' and was properly excluded by the trial judge" from the guilt phase of the capital murder trial. **Id.**

Likewise, in this case, the testimony of Appellant's expert, Dr. Morrow, was not relevant to a determination of whether Appellant was legally insane

_____

trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense." 18 Pa.C.S.A. § 314(a). Section 314 defines "mentally ill" as "[o]ne who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." 18 Pa.C.S.A. § 314(c). We also note that:

> [a] defendant found guilty but mentally ill or whose plea of guilty but mentally ill is accepted under the provisions of 18 Pa.C.S. § 314 (relating to guilty but mentally ill) may have any sentence imposed on him which may lawfully be imposed on any defendant convicted of the same offense. Before imposing sentence, the court shall hear testimony and make a finding on the issue of whether the defendant at the time of sentencing is severely mentally disabled and in need of treatment pursuant to the provisions of … the Mental Health Procedures Act [(50 P.S. § 7101 *et seq*)].

42 Pa.C.S.A. § 9727.

- 10 -

as Dr. Morrow expressly opined that Appellant knew the nature and quality of his actions in killing the victims and knew what he did was wrong, as evidenced by his attempts to dispose of evidence of the murders and his display of volitional control over his actions. *See* Pa.R.E. 401-402 (evidence is relevant if it makes a fact more or less probable, irrelevant evidence is not admissible).

Not only did Appellant fail to offer a qualified expert opinion in support of his insanity defense, we emphasize that Appellant's sole expert witness provided an opinion that contradicted his insanity defense. The opinion of a defense expert who concludes that the accused suffered from mental illness, but was not legally insane, is not sufficient to rise to the level of an insanity defense under the *M'Naghten* rule. *See Commonwealth v. Hamilton*, 329 A.2d 212, 215 (Pa. 1974) (finding that "the presence of a psychosis, albeit a severe mental disease, is not necessarily tantamount to 'insanity' under *M'Naghten*").

Nevertheless, Appellant indicates he would offer Dr. Morrow's diagnosis of paranoid schizophrenia in conjunction with the testimony of numerous lay witnesses regarding Appellant's general mental health as well as Appellant's acts, words, conversations, behavior, and appearance close to the time of the alleged crime. Appellant also seems to suggest that he would offer his own testimony in support of his insanity defense.

However, Appellant cannot handpick select portions of his expert's testimony to show an alleged mental disease, elicit only that testimony, ignore

his expert's ultimate conclusion, and then attempt to substitute lay witness testimony to attempt to establish his insanity defense.

Lay witnesses may not offer an opinion about an accused's "mental capacity in relation to the ultimate determination to be made by the jury" but may only testify as to their general opinion as to a defendant's mental capacity based on facts and observations. **Commonwealth v. Knight**, 364 A.2d 902, 909-10 (Pa. 1976).

We agree with the trial court that "a lay juror may be tempted to conflate mental illness with legal insanity when confronted with a parade of non-expert lay witness testimony regarding [Appellant's] mental state." T.C.O. at 17. Moreover, none of the lay witnesses would have been able to testify as to Appellant's state of mind at the time of the commission of the murders, but would only state their observations of Appellant's behavior and mental state before and after the murders.

The lay witness testimony as to Appellant's behavior did not provide a sufficient factual basis for the jury to find that Appellant was suffering "a defect of reason" from a mental disease that caused Appellant to be incapable of understanding the nature and quality of his act in killing the Victims and incapable of understanding that what he was doing was wrong. **See White v. Commonwealth**, 616 S.E.2d 49, 54 (Va.App. 2006), *affirmed*, 636 S.E.2d 353 (Va. 2006) (holding the trial court did not err in precluding White from raising an insanity defense when the sole defense expert testified that White was not legally insane and the proposed lay witnesses' "recital of the

defendant's behavior did not provide a factual base from which a jury could find that the defendant was suffering from a mental disorder or disease that prevented him from distinguishing right from wrong").[3]

We agree with the trial court's finding that a defendant must present expert testimony finding him **M'Naghten** insane before he can introduce lay testimony in support of his insanity defense.[4] As noted above, Appellant's sole expert witness contradicted Appellant's insanity defense and Appellant could only offer testimony from lay witnesses as to their observations of Appellant's behavior, most of which occurred days, if not weeks, before or after the Victims' murders. This would allow the jury to speculate as to whether Appellant lacked the cognitive and moral capacity to understand his actions of murdering the Victims.

As Appellant failed to provide a qualified witness to provide a factual basis to allow the jury to find Appellant was legally insane, the trial court did not err in precluding Appellant from raising an insanity defense.

---

[3] This Court may cite to the decisions of other states for persuasive authority. **See Hill v. Slippery Rock Univ.**, 138 A.3d 673, 679 n.3 (Pa.Super. 2016) (noting that "the decisions of other states are not binding authority for this Court, although they may be persuasive") (citation omitted).

[4] We recognize that this Court has held that the Commonwealth is not required to present expert testimony to prove an accused's sanity, but may offer lay testimony to show the defendant knew the nature and quality of his or her actions and knew the actions were wrong. **Yasipour**, 957 A.2d at 738–39 (finding the jury had the right to disbelieve the defendant's insanity defense and credit the testimony of the prosecution's eyewitnesses)). However, we remind Appellant that the defense has the burden to prove the insanity defense by a preponderance of the evidence.

Appellant also claims the trial court erred in denying the Monroe County Public Defender's motion to withdraw from this case due to a conflict of interest. We briefly summarize the facts related to this claim.

On March 16, 2020, Appellant filed a "Motion to Represent Self" with the assistance of his public defender, Frederick Cutaio, Esq. On April 20, 2020, the trial court held a hearing at which Appellant testified that he "didn't trust" his counsel, made allegations that his counsel had lied to him, and expressed suspicion that he was being "set up." Notes of Testimony (N.T.), Hearing, 4/20/20, at 6-8. After conducting a thorough colloquy of Appellant, the trial court denied Appellant's request to represent himself, but ordered the Public Defender's Office to assign Appellant different counsel.

On May 29, 2020, the Public Defender's Office sought reconsideration of the trial court's April 20, 2020 order and requested that conflict counsel be appointed. The Public Defender's Office asserted that Appellant had "an inherent conflict with any attorney in the office" as he "strongly disagree[d]" with strategy shared by other attorneys in the office. Petition, 5/29/20, at ¶ 15-16. After a second hearing, the trial court entered an order on June 23, 2020, denying the Public Defender's petition and again directing that Appellant be reassigned counsel from within the Public Defender's Office. On July 7, 2020, Jason LaBar, Esq., entered his appearance as trial counsel.

Our courts "review a trial court's denial of counsel's petition to withdraw under the abuse of discretion standard." ***Commonwealth v. Sandusky***, 203

A.3d 1033, 1101 (Pa.Super. 2019) (quoting *Commonwealth v. Magee*, 177

A.3d 315, 322-23 (Pa.Super. 2017)).

Our rules of criminal procedure require that an attorney for a defendant

must seek leave of court in order to withdraw his or her appearance. *See*

Pa.R.Crim.P. 120(b)(1). The comment to Rule 120 states in relevant part:

> The court must make a determination of the status of a case
> before permitting counsel to withdraw. Although there are many
> factors considered by the court in determining whether there is
> good cause to permit the withdrawal of counsel, when granting
> leave, the court should determine whether new counsel will be
> stepping in or the defendant is proceeding without counsel, and
> that the change in attorneys will not delay the proceedings or
> prejudice the defendant, particularly concerning time limits.

Pa.R.Crim.P. 120, cmt.

> This Court has provided that:
>
> [n]o brightline rules exist to determine whether a trial court has
> abused its discretion in denying a Petition to Withdraw as counsel.
> A balancing test must be utilized to weigh the interests of the
> client in a fair adjudication and the Commonwealth in the efficient
> administration of justice. Thus, a resolution of the problem turns
> upon a case by case analysis with particular attention to the
> reasons given by the trial court at the time the request for
> withdrawal is denied.

*Sandusky*, 203 A.3d at 1102 (quoting *Magee*, 177 A.3d at 322-23).

In this case, the Public Defender's Office sought to withdraw from

Appellant's case and requested that conflict counsel be appointed, based on

an alleged conflict of interest. Specifically, the Public Defender's Office argued

that as Appellant "strongly disagree[d] with the strategy" as discussed by the

attorneys in the office, Appellant would "have an inherent conflict with any attorney in the office." Petition to be Relieved as Counsel, 5/29/20, at 2.

In his appellate brief, Appellant cites to *Commonwealth v. Watson*, 835 A.2d 786 (Pa.Super. 2003), in which this Court recognized that the Public Defender's Office is considered to be a single law office. Thus, Appellant argues that any conflict he had with his assigned public defender would be imputed to the entire Public Defender's office and disqualify all of its attorneys from representing Appellant.

It is well established that "[t]o show an actual conflict of interest, the appellant must demonstrate that: (1) counsel actively represented conflicting interests; and (2) those conflicting interests adversely affected his lawyer's performance." *Commonwealth v. Campbell*, 260 A.3d 272, 278 (Pa.Super. 2021) (quoting *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1147 (Pa. 2012) (internal quotation marks omitted)). Our Supreme Court has specified that a "'material disagreement' with respect to a course of action in the representation does not constitute a conflict of interest." *Commonwealth v. Padilla*, 80 A.3d 1238, 1247 n. 10 (Pa. 2013).

In this case, the trial court was correct in finding that Appellant's disagreement with his public defender as to trial strategy was not a conflict of interest. Further, we agree with the trial court's assessment that, given Appellant's mental health issues, Appellant's disagreement with his counsel would likely not have been resolved by an assignment of new counsel from a different office. Thus, Appellant is not entitled to relief on this claim.

- 16 -

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/2023