670 A.2d 1129

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Dino Martin RUCCI, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 18, 1995.

Decided Jan. 18, 1996.

Glen Alterio, Canonsberg, for D.M. Rucci.

John C. Pettit, Washington, DC, Robert A. Graci, Harrisburg, for Com.

Before NIX, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *OPINION*

CAPPY, Justice.

On September 24, 1992, the Appellant was convicted by a jury of Murder in the First Degree, Robbery and Burglary, in the June 28, 1989 stabbing death of Louise M. Fridley who was the 61 year old aunt of Appellant's wife.[1] This is a direct appeal from the imposition of the death penalty. 42 Pa.C.S.A. § 9711(h)(1).

### *Sufficiency of the Evidence*

Appellant challenges the sufficiency of the evidence to support the convictions of murder, burglary and robbery. When reviewing a sufficiency of the evidence claim, an appellate court must view all the evidence and reasonable infer-

---

1. Appellant had previously been tried upon these charges but the first trial ended in a mistrial when the jury deadlocked.

ences therefrom in a light most favorable to the Common-wealth as the verdict winner and must determine whether the evidence was such as to enable a factfinder to find that all of the elements of the offenses were established beyond a rea-sonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). Insofar as the Commonwealth's case primarily relies upon circumstantial evidence, a detailed re-view of the evidence is necessary. As we find that the trial court's summary of the evidence is fully supported by our independent review of the record, we adopt it as our own. The trial court stated the following:

The victim and her husband, Larry Fridley, resided at R.D. # 8, Box 57, Lone Pine, Amwell Township, Washington County, Pennsylvania. On Wednesday June 28, 1989, at approximately 10:00 a.m., Mr. Fridley left on his weekly four day trip to Revenna [sic], Ohio, where he operated a self-serve water distillation business. Mr. Fridley usually drove his van to Ravenna, however, on this occasion he drove his wife's car, as he was experiencing mechanical problems with the van.[2] The victim had been working at the Century Inn restaurant as a waitress/hostess for ap-proximately 12 years, but had recently retired. After a seven day retirement, she decided to return to work and went for an interview in the afternoon of June 28, for a part time waitressing position at Bob Evans restaurant in Wash-ington, Pennsylvania

After her interview, Mrs. Fridley went to the home of her daughter, Edwina Phillips for dinner. Mrs. Phillips lives approximately 1½ miles away from her mother. At approxi-mately 6:30 p.m., the victim drove home in her daughter's car. The victim's granddaughter, Donna Curry visited her at approximately 8:30 p.m. and remained with her until approximately 9:00 p.m. At approximately 9:15 p.m., Edwi-na Phillips drove past the victim's house and observed that the house was dark. Mrs. Phillips noticed no unauthorized or otherwise suspicious vehicles parked in front of her

2. The Fridley's possessed two vehicles (ie. [sic] a 1977 Dodge van and a 1977 Buick).

mother's house. At approximately 9:30 p.m., Mrs. Phillips telephoned her mother but there was no answer.

On Thursday, June 29, 1989, at approximately 10:00 a.m., the granddaughter, Donna Curry, telephoned Mrs. Fridley but again, there was no answer. She contacted her mother and sister, Amy Gibson, and they all drove to the victim's home to check on her. Upon their arrival, they found the front door ajar. They entered and found the victim in her upstairs bedroom lying face down in a pool of blood. Frantically, they sped to the Phillips home to get the victim's son-in-law, Donald Phillips. He arrived on the scene, viewed the body and at approximately 12:00 p.m. called the Pennsylvania State Police.

Within the next hour an assortment of police, coroner and emergency medical personnel arrived. While the police secured the scene and began their investigation, the coroner photographed and removed the body for autopsy. Shortly after the police arrived, Amy Gibson and Donna Curry, while standing outside the victim's house, saw the defendant drive slowly by the crime scene three times within a half hour without stopping. The victim's granddaughters informed the police of the defendant's conduct since they thought it was suspicious that the defendant did not stop to ask about the reason for all the activity (ie. [sic] police cars, ambulances, coroner, etc.).

Through the testimony of Coroner Farrell Jackson and pictures produced at trial it was established that the interior of the victim's home was relatively undisturbed. Both Edwina Phillips and Donna Curry testified that the only item missing was a 2' × 2' cedar box containing approximately $3,000.00 in small bills ($1, $5, $10, $20), the money that the victim had saved from her employment at Century Inn. Mrs. Curry testified that approximately three days prior to Mrs. Fridley's death she had helped her count the money that her grandmother kept in the cedar box. Additionally, Mrs. Curry testified that the defendant's wife, Mona Lisa Rucci, knew that the victim (Mona Lisa's aunt) kept a substantial amount of money in the cedar box

because the day before her death the victim gave Mrs. Rucci $20.00 that she saw her remove from the box.

After performing an autopsy, Forensic Pathologist Dr. Earnest Abernathy concluded that the victim died at approximately 9:30 p.m., June 28, resulting from massive hemorrhaging due to multiple stab wounds (approximately 24), some of which severed the jugular vein and corotid [sic] artery. Dr. Abernathy further indicated that the stab wounds to the chest, back and neck were inflicted with great force. Finally, he testified that there were defense wounds to the victim[']s hands, which indicate that the victim struggled with her assailant before she was overcome.

As a result of the report that the defendant drove by the crime scene multiple times without stopping, the Pennsylvania State Police became interested in questioning him. Toward this end they initiated an inquiry for him and his vehicle, a brown two door Chevy Cavilier [sic].

At approximately 5:30 p.m., on June 29, 1989, Corporal William T. Flemming, Pennsylvania State Police, observed the defendant operating the vehicle at a high rate of speed and "hugging" the center on a rural road approximately 10 miles from Marianna, Pa., Corporal Flemming stopped the vehicle suspecting the defendant was intoxicated. After giving the defendant a field sobriety test and concluding that he was not intoxicated, Corporal Flemming asked the defendant to accompany him to the state police barracks in Washington, Pennsylvania to be interviewed on a matter unrelated to the speeding. The defendant agreed but wanted to go home to change clothes first. Defendant and his wife Mona Lisa lived at 702 Seventh Street, Marianna, Washington County, Pennsylvania, approximately seven miles from the victim's residence. After returning home, changing clothes and dropping off his car, the defendant was taken to the state police barracks to be interviewed concerning any knowledge he may have with respect to Mrs. Fridley's death. One trooper remained at the defendant's residence to secure it.

Troopers Bernard Stanek and James Patt, who were assigned to investigate the Fridley homicide, interviewed the defendant. The defendant told the officers the following: 1) During the day of June 28, 1989, he was with his wife, Mona Lisa, as she was admitted to Washington Hospital located in Washington, Pennsylvania to receive treatment for an illness. 2) At 4:00 p.m. he left Washington Hospital to return home. 3) En route home he stopped at the victim's home to tell her about her niece's[ ] condition, but found nobody home. 4) At approximately 6:00 p.m., he returned to the hospital and remained there until approximately 9:00 p.m. 5) At approximately 9:00 p.m. he went home (Marianna, Pa.) and remained there until approximately 9:00 a.m. on June 29, 1989. After the interview at the state police barracks the defendant returned to his home, no arrest made.

On June 29, 1989, the defendant's wife, Mona Lisa Rucci, consented to a search of their house and automobile.[3] The search of the defendant's residence produced shoes, a pair of pants, a knife, and a radio. The search of the vehicle produced $1,086.00 in cash, ($1, $5, $10, $20 denominations) which was found in the trunk of the car.

On July 2, 1989, pursuant to a search warrant, the defendant's house was searched again. This search produced numerous items including blood stained clothing, which was retrieved from the defendant's washing machine. All items seized were sent to the F.B.I. crime lab in Washington, D.C. for analysis.

On July 6, 1989, the defendant's mother telephoned Trooper Stanek to say that her son wanted to speak to the police. Troopers Stanek and Patt interviewed the defendant at Jefferson Memorial Hospital, where the defendant had admitted himself to the detoxification unit. The defendant told the officer's [sic] the following: 1) He expressed his anger at the thought of being accused of killing Mrs.

---

3. Mrs. Rucci executed two voluntary consent forms. She was the title owner of the vehicle; the residence in Marianna, Pennsylvania where she and the defendant resided was the family home owcd [sic] by Mona Lisa Rucci's parents who were deceased.

Fridley. 2) He denied any involvement in the killing. 3) He admitted that $800.00 of the money found in the trunk of the car was his. The Defendant then terminated the interview.

On April 25, 1990, pursuant to a search warrant, hair and blood samples were taken from the defendant's person while he was incarcerated at SCI–Mercer on unrelated charges. These samples were also sent to the F.B.I. crime lab for analysis.

Following a 1½ year long investigation, the defendant was arrested and charged with Criminal Homicide, Burglary and Robbery on November 16, 1990.

Although the defendant did not testify at trial, through the direct and cross examination of commonwealth [sic] witnesses, Troopers Patt and Stanek who interviewed the defendant in 1989, they related the defendant[']s movements as told to them by the defendant. (From 6:00 p.m. on June 28 to 9:00 a.m. on June 29, 1989 that he was at the Washington Hospital and his home on the night of the homicide.)

At trial, the defendant's alibi was challenged by the testimony of numerous witnesses who placed him or his car at or near the crime scene on the evening or early morning of the homicide. Richard and Kristin Earnest, while driving in separate vehicles each saw the defendant's car at approximately 10:00 p.m. on June 28th parked along state route 2047, about two miles from the victim's residence.[4]

The defendant's alibi was further contradicted by Romaine Sanders, a next door neighbor of the Fridley's [sic]. On the night of the homicide, Mrs. Sanders was returning home from work at approximately 8:20 p.m. As she attempted to pull into her driveway, a man walked in front of her vehicle with his eyes fixed straight ahead. She later identified the man as Dino Martin Rucci, the defendant, when she observed his picture in a newspaper sometime in November of 1989.

---

4. The Earnests described the car as a dirty, goldish colored, two door, Chevrolet.

Ms. Ina Prile, who lived across the street from the defendant's residence in Marianna, Pennsylvania testified that between noon and 1:00 p.m. on the day of the 28th she had seen the defendant in the Fredricktown, Pennsylvania housing projects, at the home of her friend Gail Dixon. However, after returning to her Marianna home that evening she was awakened between 2:00 a.m. and 4:00 a.m. by barking dogs and the sound of car doors slamming. She looked out of her bedroom window, which faces the defendant's residence, and saw the defendant removing an object from the trunk of his car.

She also saw the defendant at the home of the said Gail Dixon on the afternoon of June 29th in the possession of a large knife. The defendant's possessing a large knife around this time was further corroborated by Ms. Dixon, her boyfriend, Conrad Porter, and her sister Theresa Pritchert.

The defendant's alibi as to the morning of June 29, 1989 was further contradicted by the testimony of Connie Jo and Lisa Cecil and Earnest J. McDaniels. Connie Jo and Lisa Cecil saw the defendant, whom they knew, park his car and walk toward the post office in Marianna, Pennsylvania at approximately 6:30 a.m. on the morning of June 29th. Earnest J. McDaniels testified that the defendant appeared at his home in Brownsville, Pennsylvania at approximately 7:45 a.m. He wanted Mr. McDaniels to assist him in locating Russell Brooks so he could buy some pills. While they were looking for Mr. Brooks, Mr. McDaniels saw the defendant pull out a paper bag containing a large sum of money and noticed some scratches on the defendant's hands. When asked about the money, the defendant told McDaniels that he had robbed a house in Washington County. Additionally, he attributed the scratches to a scuffle with some girl the night before. Russell Brooks corroborated McDaniel's testimony that the defendant had a large sum of money.

The final pieces of relevant inculpatory evidence consist of physical evidence, testimony regarding the defendant's pro-

pensity for carrying a knife and various admissions made by the defendant.

The clothing seized from the washer in the defendant's house on July 2, 1989, was analyzed at the F.B.I. laboratory in Washington, D.C. Special Agent Richard Rheem, an expert in serology, testified regarding blood stains that were found on those clothes (defendant's pants). Agent Rheem concluded that the blood was of the same general type (PGM+1) as the victim[']s and that it was definitely not the defendant's or his wife's blood type.

While the murder weapon was never found, several witnesses testified that the defendant was in the habit of carrying a knife. Gail Dixon, Theresa Pritchert and Conrad Porter testified that they saw the defendant with a large knife around the time of the homicide, June 28, 1989.

The prosecution produced a series of audio tapes of conversations between the defendant and a fellow inmate, George "Rocky" Balboa, which occurred at the S.C.I. in Mercer, Pennsylvania.[5] These tapes contained many inculpatory references by Mr. Balboa and admissions by the defendant. Mr. Balboa testified that he and the defendant had become good friends while incarcerated at S.C.I. Mercer and that the defendant confessed killing Mrs. Fridley. Balboa testified that the defendant told him that on the evening of the 28th, the victim was supposed to be away. The defendant broke in the home, and to his surprise found the victim. He then, with a knife he was carrying, stabbed her multiple times in the neck and back areas, killing her. He then removed the aforedescribed [sic] money, and used it to buy drugs. After this confession, Mr. Balboa contacted the authorities and agreed to wear a wire to tape his future conversations with the defendant. At trial, approximately six hours of taped conversations were played for the jury. Parts of the conversations were in italian [sic]. These parts were translated into english [sic] in written form and verba-

---

5. Days following the homicide the defendant was arrested for unrelated parole violations and incarcerated at S.C.I. Mercer. He was subsequently transferred to S.C.I. Greensburg.

tim transcripts of the wired conversations were given to the court, counsel and the jury to aid them in following the tape playback.

Though witnesses for the defendant testified that they had never heard the defendant speak italian [sic], two corrections officers at S.C.I. Mercer, Cindy Hooks and David Jewel, testified that they both overheard the defendant speaking italian [sic] with Mr. Balboa. On the tapes, Mr. Balboa repeatedly referred to the defendant as "Accultio", which is italian [sic] for knifeman. The defendant described himself as "the Charlie Manson of Washington County." The defendant made a statement to Mr. Balboa in italian [sic] which was translated as "I did it this way, I took the knife in the stomach 24 times, boom, boom, boom, like Zorro in the house."

In addition to the tapes, an inmate who was incarcerated at SCI–Greensburg with the defendant, Barry Baker, testified to other incriminating statements.... He also testified that the defendant said of his wife, Mona Lisa Rucci, "I should have killed that bitch too".

Trial court slip op. pp. 2–11.[6]

 We note that circumstantial evidence alone can constitute sufficient evidence to support a conviction. *Commonwealth v. Smith*, 523 Pa. 577, 568 A.2d 600 (1989); *Commonwealth v. Petrisko*, 442 Pa. 575, 275 A.2d 46 (1971); *Commonwealth v. Lewis*, 407 Pa.Super. 186, 595 A.2d 593 (1991). When viewing the above related circumstantial evidence and all reasonable inferences deducible therefrom in a light most favorable to the Commonwealth, *Burgos, supra,* we conclude that the evidence was sufficient to establish that 1) Appellant, without privilege, entered the Fridley residence and at the time he did so, he had an intent to commit a crime therein, 18 Pa.C.S.A. § 3502 (Burglary); 2) Appellant, in the course of committing a theft of the Fridley

**6.** The numbering of the footnotes in the quote from the trial court opinion is as in the original. The footnote numbering in this opinion by the Supreme Court merely incorporates the footnote numbers of the trial court as if they are original to this opinion.

money, inflicted serious bodily harm upon Mrs. Fridley, 18 Pa.C.S.A. § 3701 (Robbery); and 3) that Appellant intentionally caused the death of Mrs. Fridley, 18 Pa.C.S.A. §§ 2501 & 2502(a). *See also Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481 (1980) (the specific intent to kill may be inferred from the use of deadly force upon a vital part of the human body).

### Verdict was Against the Weight of the Evidence

In a rather summary fashion, the Appellant alleges that the verdict was against the weight of the evidence.[7] As this Court has repeatedly stated, "[t]he decision to grant or deny a motion for a new trial on the ground that the verdict is against the weight of the evidence is committed to the sound discretion of the trial court. Absent an abuse of discretion its denial of such a motion will not be disturbed." *Commonwealth v. Griffin*, 511 Pa. 553, 561, 515 A.2d 865, 869 (1986) (citing *Commonwealth v. Zapata*, 447 Pa. 322, 290 A.2d 114 (1972)). As Appellant has utterly failed to demonstrate that the evidence produced by the Commonwealth was so unreliable or self-contradictory as to make any verdict based thereon against the weight of the evidence, he has failed to carry his burden to show that the trial court abused its discretion in denying the motion for a new trial based on the weight of the evidence. *See Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993) (quoting *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976) (an allegation that the verdict is against the weight of the evidence is primarily to be resolved by the trial court as it has the benefit of seeing the witnesses.))

7. After setting forth the correct legal standard for granting a new trial on the basis of the verdict being against the weight of the evidence, the Appellant's complete argument is as follows:

> When applying the law to the evidence presented, as stated in the prior argument [relating to the sufficiency of the evidence] the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail. Appellant's Brief at 13.

*Pennsylvania Rule of Criminal Procedure No. 2010*

The Commonwealth obtained a search warrant for Appellant's residence and seized certain items there. In addition, the Commonwealth obtained a search warrant for taking hair and blood samples from Appellant's person while he was incarcerated. Appellant alleges that rather than the search warrants and their supporting papers being forwarded to the appropriate Court of Common Pleas as required by Rule No. 2010, these papers remained with the issuing magistrates.

Pa.R.Crim.P. No. 2010 provides that

> The judicial officer to whom the warrant was returned shall file the search warrant, all supporting affidavits, and the inventory with the clerk of the court of common pleas of the judicial district in which the property was seized.

The trial court noted that evidence suggests that Rule No. 2010 was indeed violated. Trial court slip op. at 14. Appellant contends that this violation required suppression of the items seized and it was error for the trial court to refuse to suppress the same.

Initially, we note that not all violations of the Rules of Criminal Procedure mandate the remedy of suppression. As we stated in *Commonwealth v. Mason*, 507 Pa. 396, 406–7, 490 A.2d 421, 426 (1985):

> exclusion/suppression of evidence is not an appropriate remedy for every violation of the Pennsylvania Rules of Criminal Procedure concerning searches and seizures. It is only where the violation also implicates fundamental, constitutional concerns, is conducted in bad faith or has substantially prejudiced the defendant that exclusion *may* be an appropriate remedy.

In *Mason*, this Court concluded that a violation of Pa. R.Crim.P. No. 2004 (relating to the appropriate person to serve a warrant) did not mandate suppression of evidence where there was no showing of prejudice. Although the violation in the instant case involves Rule No. 2010, nevertheless the reasoning of *Mason* is equally applicable.

■ First, we note that Appellant does not assert that the violation of Rule No. 2010 implicates fundamental constitutional concerns. Indeed, under the circumstances of this case, we believe that the retention of the warrants and the supporting papers by the district magistrates rather than the magistrates filing these with the appropriate Court of Common Pleas would not implicate fundamental constitutional concerns especially, where as here, the defendant had copies of the warrants and supporting papers one full year before the suppression hearing. Moreover, Appellant does not allege and the record does not support a finding that the violation of Rule 2010 was done in bad faith. We are left then to determine whether the technical violation of Rule 2010 so prejudiced Appellant that suppression would be the appropriate remedy.

In this regard, we note that the trial court found that Appellant "at each step of the proceedings ... received copies of the search warrants and received copies of the receipts of any items taken and copies of reports." Suppression Hearing Transcript 5/26/92 at p. 87. The Commonwealth included as part of the "Commonwealth's Third Discovery Answer," [8] which was filed on May 23, 1991, copies of the appropriate papers. Accordingly, the Appellant had copies of the appropriate papers one year before the suppression hearing and Appellant's first trial, and sixteen months before his second

8. Our review of the record discloses that the Commonwealth's Third Discovery Answer included copies of the search warrant, supporting affidavit and inventory for the search of the Rucci residence and the affidavit and inventory for the removal of hair and blood from Appellant; however, a copy of the search warrant for the hair and blood was not included in the record sent to this court. We note, however, that defense counsel, Mr. Alterio, stated at the Suppression hearing that he received a copy of the search warrant for the blood and the hair samples during discovery. The following exchange took place between the Court and Mr. Alterio and Mr. Petro, the prosecutor:

The Court: Do you have a copy of it, Mr. Alterio?
Mr. Alterio: Which warrant, Your Honor?
The Court: The one on the hair samples and the blood.
Mr. Alterio: Yes, I do.
Mr. Petro: I believe that copy was furnished to the defendant as part of the Discovery and—
Mr. Alterio: Yes.
Suppression Hearing Transcript, 5/26/92 at pp. 15–16.

trial.[9] Hence, Appellant has utterly failed to show that the violation of Rule 2010 has worked to prejudice him. Thus we agree with the trial court that this issue affords Appellant no relief since "the defendant's rights were in no way prejudiced because he received all the information he was supposed to receive...." *Id.* at 88.

*Suppression Due to Allegedly Invalid Third Party Consent*

On June 29, 1989, the police received the consent of Appellant's wife to search the home in which Appellant and his wife lived. The police had to go to the hospital to obtain the consent of the wife. The wife was hospitalized for abdominal pain and fever for which she received medications including Tylenol, Unasyn, Gastroview, Vistaril, Demoral and Phenobarbital. Suppression Hearing Transcript 5/26/92, at pp. 64–65. The police obtained consent from the wife to search the home, as well as the wife's consent to search the car which Appellant operated and which was titled in the wife's name.

Appellant argues that the Commonwealth did not meet its burden of proving at the Suppression Hearing that the consents to search were voluntarily, knowingly and intelligently given. *Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85 (1973). Appellant asserts that the Commonwealth failed to present any evidence that the medications which the wife was taking did not impair her ability to give a valid consent. Appellant's allegation is belied by the record. The Commonwealth presented the testimony of Dr. Ross Richardson, a staff physician at Washington Hospital. He testified that the drugs which Appellant's wife received would not have affected her ability to understand. Suppression Hearing Transcript 5/26/96, at pp. 65–67. Moreover, the state police officers who presented the consent forms to Appellant's wife asked permission of the nurses before they approached Appellant's wife and also testified at the Suppression Hearing that she had no

9. Even assuming *arguendo* that the Commonwealth's Third Discovery Answer did not contain a copy of the search warrant for the hair and blood samples, we cannot conclude that Appellant was prejudiced thereby, given that Appellant definitely had copies of the affidavit and inventory.

280

trouble understanding the forms or the explanations. Accordingly, this issue does not afford Appellant relief.[10]

### Suppression of Appellant's Two Statements

Appellant claims that his *Miranda* rights were violated when the police obtained statements from him on June 29, 1989 and July 6, 1989, and that the trial court erred in failing to suppress these statements. Appellant argues that because the police officer testified that Appellant appeared to be high during the June 29, 1989 interview, he could not have voluntarily, knowingly and intelligently waived his *Miranda* rights. Appellant fails to allege that he was actually high at this time.

As for the July 6, 1989 interview and statement, Appellant was hospitalized for detoxification. He alleges that he was in "psychological state of detoxification such that he could not make a voluntary or intelligent waiver of his rights." Appellant's Brief at 21.

Because *Miranda* is wholly inapplicable in this situation for the reasons which follow, Appellant's argument is without merit. The protective provisions of *Miranda* prohibit an interviewee who is in police custody from being subjected to interrogation after the interviewee has asserted his right to remain silent and/or to consult with an attorney. *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985). An interviewee undergoes custodial interrogation whenever the person is physically deprived of freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. *Commonwealth v. Chacko*, 500 Pa. 571, 573, 459 A.2d 311, 314 (1983). The trial court found, and we agree, that in neither of these two situations was Appellant undergo-

10. The home in which Appellant and his wife lived rent free was owned by the estate of his wife's parents. The police, in an apparent abundance of caution, also obtained the executor's consent to search the home. Appellant raises the validity of the third party consent given by the executor. However, as we have determined that the wife's consent was validly given and thus the subsequent search was valid based thereon, we need not reach the issue of the validity of the executor's consent.

ing custodial interrogation. On June 29, 1989, the police **requested** that Appellant accompany them to the state police barracks. The trial court found that "while the first statement [*i.e.*, the June 29th statement] was given at the police barracks, the defendant **volunteered** to accompany the troopers to answer some questions about the Fridley homicide. Additionally, the defendant was **free to terminate the interview and leave at any time.**" Trial court slip op. at 16–17 (emphasis added). As Appellant was free to leave at any time, he was most certainly not in custody. Given that he was not in custody, the protections of *Miranda* were not applicable.

■ On July 6, 1989, Appellant's mother telephoned a trooper and informed the trooper that Appellant wanted to talk to the police. Two troopers went to the hospital, requested permission of the hospital staff to interview Appellant and, after receiving permission, interviewed Appellant. In the course of the interview, Appellant grew angry and asked the police to leave. The police complied with his request. The trial court found that under these circumstances, the police did not conduct a custodial interrogation which would have required the providing of *Miranda* warnings. Again, we agree.

As neither interview amounted to a custodial interrogation, Appellant was not entitled to receive *Miranda* warnings and, as such, the police did not violate any of Appellant's constitutional rights in not giving him these warnings. Accordingly, this issue affords Appellant no relief. *Miranda* being wholly inapplicable, the fact of his mental condition during the interviews is of no consequence to the admissibility of his statements; rather, his mental condition goes to the evidentiary weight which the jury should have given to such statements.

### Alleged Brady Violations

■ Appellant requested that the trial court give him access to the victim's bank records as well as to the financial records of the business operated by the victim's husband in Ohio. The asserted reason for the request was the fact that the Commonwealth's proof involved showing that the victim

kept large sums of cash at home especially 3–4 days prior to the murder, which sums could not be located after the murder, and Appellant was found to be in possession of approximately $1,000, the day after the murder. Appellant alleges that he wanted the statements so as to be able to reconstruct the victim's financial situation to show that either the large sums of money were deposited in the bank and/or used to pay bills or did not exist because allegedly Appellant had some information to show that the victim was living from paycheck to paycheck and unable to save any money. The Commonwealth objected to the broad request and the Court limited the information to the one joint checking account belonging to the victim and her husband. Appellant argues that where the undisclosed information is material, i.e., the omitted evidence would have created areas of reasonable doubt that did not otherwise exist or might have affected the outcome of the trial, a new trial is required. Appellant cites several cases including *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Commonwealth v. Wilder*, 461 Pa. 597, 337 A.2d 564 (1974); *Commonwealth v. Wallace*, 500 Pa. 270, 455 A.2d 1187 (1983); and *Commonwealth v. Hicks*, 270 Pa.Super. 546, 411 A.2d 1220 (1979) in support of this argument. However, we find these cases inapposite to the current case. All the cases upon which Appellant relies involved wrongful conduct attributable to the prosecution in withholding and/or suppressing exculpatory evidence. Unlike those cases, there is no evidence here (and Appellant points to none) that the prosecution engaged in misconduct to conceal and/or suppress exculpatory evidence. The prosecution's objections to the breadth of the discovery request by Appellant, which were sustained by the trial court, is not misconduct and therefore did not deprive Appellant of his due process rights. *See Commonwealth v. Travaglia*, 541 Pa. 108, 131–32, 661 A.2d 352, 363 (1995) (argument that prosecutor engaged in misconduct when he objected to admission of evidence was meritless, especially since the objection had a legitimate basis).

Additionally, Appellant argues that the trial court erred in denying Appellant the full breadth of his discovery

request. We note that questions involving discovery in criminal cases lie within the discretion of the trial court and that court's decision will not be reversed unless such discretion was abused. *Commonwealth v. Gockley*, 411 Pa. 437, 449, 192 A.2d 693, 699 (1963). *See also* Pa.R.Crim.P. No. 305(B)(2) (the court may order the discovery of requested items "upon a showing that they are material to the preparation of the defense, and that the request is reasonable.") In limiting the discovery to only the victim's joint account with her husband for the dates between December 19, 1988 and July 19, 1989, the trial court concluded that those records were

the only ones which the defendant showed to be relevant to his allegation that the victim could not have had a large sum of money in her house at the time of the homicide.[14] A trial court may grant a discovery request for disclosure of information if the party requesting the information shows how a disclosure would benefit his case and how it is material. Since the defendant made no such showing with respect to the records of Mr. Fridley, his request at best amounts to a fishing expedition. As such it was properly denied.

[14] The court notes the bank records did not contain anything exculpatory for the defendant.

As the record supports the trial court's conclusion, there was no abuse of discretion. Accordingly, this issue affords Appellant no relief.

### Venue or Venire Change

Appellant notes that there was extensive coverage in the newspapers concerning the murder, his arrest and the 2 trials. Appellant alleges that the coverage was so sustained, pervasive, and inflammatory as to require a change of venue without the need to show any actual prejudice. Appellant acknowledges that the general rule is that a change of venue or venire is committed to the sound discretion of the trial court. *Commonwealth v. Patterson*, 392 Pa.Super. 331, 572 A.2d 1258 (1990), *appeal denied*, 527 Pa. 631, 592 A.2d 1299 (1991). Appellant also acknowledges that generally a defendant must demonstrate that pre-trial publicity resulted in

actual prejudice preventing the impaneling of an impartial jury. *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28 (1991). We note that in order for pre-trial publicity to be presumptively prejudicial, a defendant must prove two points: first, either that a) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual or objective; b) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; or c) the publicity is derived from police and prosecuting officer reports; and, secondly, that the publicity must be so extensive, sustained, and pervasive without sufficient time between publication and trial for the prejudice to dissipate, that the community must be deemed to have been saturated. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978).

Although some of the articles to which Appellant points us do refer to Appellant's alleged admissions and allude to Appellant's prior criminal history, we cannot conclude that the publicity was so extensive, sustained and pervasive that the community must be deemed to have been saturated. Indeed, quite the contrary was proven at the individual voir dire of the 121 prospective jurors. As the trial court noted, 11 of the principal jurors selected had no knowledge of the facts of the case and the 12th juror had a small amount of knowledge but no fixed opinion as to guilt or innocence. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) ("It is not required, however, that the jurors be totally ignorant of the facts and issues involved.") Furthermore, the trial court noted that of the 121 prospective jurors who were individually voir dired over 4 days, only 7 had any detailed knowledge of the case. This leads us to the conclusion that the community was not saturated and as such, Appellant had failed to meet his burden of showing that the pre-trial publicity was prejudicial per se. Compare this present situation with *Casper, supra*, (where despite the fact that roughly ⅓ of the venirepersons had some knowledge of the facts of that case, the court nevertheless held that no presumptive prejudice was

proven) and *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902 (1991) (where despite the fact that 34 of the 70 potential jurors knew something about the case, the court held that there was no proof of presumptive prejudice). Accordingly, we cannot conclude that the trial court abused its discretion in denying the motions for change of venue or of venire. Thus, this issue does not afford Appellant relief.

### Photographs

The trial court, over defense objection, permitted the jury to take with them into the deliberations room two small color photographs, which were admitted as exhibits at trial, which depicted the deceased victim laying on her bedroom floor as she had been found at the scene of the crime. Some blood is visible. Appellant does not allege that it was error for the court to admit these photographs, rather Appellant alleges that the trial court abused its discretion in permitting the jury to take these photos with them into the deliberations room.

Pa.R.Crim.P. No. 1114 provides that:

Upon retiring for deliberations, the jury shall not be permitted to have a transcript of any trial testimony, nor a copy of any written confession by the defendant, nor a copy of the information or indictment. Otherwise, upon retiring, the jury may take with it such exhibits as the trial judge deems proper.

In interpreting this rule, this Court has noted that such trial court decisions are committed to the trial court's discretion and will not be reversed absent an abuse of that discretion. *Commonwealth v. Brown,* 467 Pa. 388, 357 A.2d 147 (1976). An abuse of discretion "is not merely an error of judgement, but if in reaching a conclusion the law is overridden or misapplied, or the judgement exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence of record, discretion is abused." *Melzer v. Witsberger,* 505 Pa. 462, 475, 480 A.2d 991, 997 (1984). *See also Commonwealth v. Long,* 533 Pa. 388, 625 A.2d 630 (1993). We note that the photographs were clearly admissible

and thus their probative value outweighed their prejudicial value. Moreover, because Appellant's assertion that the jurors' possession of these photographs is a reflection of the trial court's bias, prejudice, ill-will or partiality in favor of the Commonwealth and against the defendant is without support in the record, this claim must fail. *See Commonwealth v. Faulkner, supra* (where defendant fails to advance an argument to support a claim that the trial judge abused its discretion in permitting graphic photos to accompany the jurors into deliberation, no error was found). Accordingly, this issue affords Appellant no relief.

### Statement That He Should Have Killed His Wife

While being questioned on the stand by the Commonwealth, Barry Baker, who had been incarcerated with the Appellant, testified that during a conversation where Baker asked Appellant about the crimes involving the Fridley murder and burglary, Appellant said "I should have killed that b—ch too." Baker testified that Appellant meant that he should have killed his wife also. Appellant's attorney objected. The trial court overruled the objection. Baker testified that earlier in the course of this conversation, Appellant denied committing the murder of Mrs. Fridley. Appellant argues that "[t]he testimony of Mr. Baker must be considered testimony of other crimes as Mr. Baker testified that defendant denied killing [the] victim in this case. Therefore the jury could infer defendant had killed someone in the past." Appellant's Brief at 36. Thus according to Appellant, testimony of other crimes was admitted without falling into any recognized exception to the rule which prohibits prior crimes evidence to come in. Appellant further contends that he was prejudiced by this.

We note that although the jury could infer from the word "too" that Appellant had killed someone else in the past, an equally plausible inference which the jury could have drawn is that the word "too" in this context meant that the Appellant should have killed his wife in addition to committing the burglary since Appellant and Baker had earlier been discussing the burglary. Thus it is not at all clear that this reference

brought before the jury consideration of prior crimes. In the absence of some proof that the jury made the inference which Appellant alleges, we cannot conclude that use of the one word "too" in this context impermissibly brought before the jury evidence of prior crimes. Accordingly, this issue does not afford Appellant relief.

### *Prosecutorial Misconduct in the Closing Arguments*

█ Appellant alleges that the Prosecutor made numerous references to his [*i.e.*, the Prosecutor's] personal opinion as to the evidence and witnesses telling the truth. He made various references to defense counsel setting up "smoke screens". He informed the jury that Barry Baker and George Balboa, both commonwealth [sic] witnesses, were telling the truth, were credible and were believable.

He misquoted testimony and made reference to a portion of defendant's oral statement which was not testified to.

Appellant's Brief at 39. Appellant fails to direct our attention to any specific example or cite to the record. We admonish counsel that it is their duty to cite to the record so as to facilitate the Court's review of their claims. Nevertheless, we have thoroughly reviewed the record and, while the prosecutor did in fact make some statements which may be fairly characterized as Appellant has done, we find that none of them rise to the level of prejudice which requires the grant of a new trial. Accordingly, this issue does not afford Appellant any relief. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995).

### *Sentencing Phase*

█ As is our duty, 42 Pa.C.S.A. § 9711(h)(3)(ii), we have reviewed the record to determine if there is sufficient evidence to support the aggravating circumstance of committing a murder in the course of a felony (i.e., robbery). As we have already determined that there is sufficient evidence to sustain the conviction of robbery, and the jury found that the aggravating circumstance was murder in the course of a robbery, we

find that there is sufficient evidence to support the jury's finding of this aggravating circumstance.

Additionally, we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts and conclude that the sentence of death is not disproportionate. 42 Pa.C.S.A. § 9711(h)(3)(iii). *See also Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). Neither do we find that the sentence of death is the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(i).

Accordingly, the verdicts are affirmed and the sentences are likewise affirmed.[11]

FLAHERTY, J., did not participate in the consideration or decision of this matter.

11. The Prothonotary of the Supreme Court is directed to transmit the complete record of the case at bar to the Governor of Pennsylvania. 42 Pa.C.S.A. § 9711(i)