**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Shawn REED Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 13, 2004.

Filed June 3, 2004.

---

MaryJean Glick, Lancaster, for appellant.

Matthew Grosh, Asst. Dist. Atty., Lancaster, for Com., appellee.

Before: STEVENS, PANELLA and OLSZEWSKI, JJ.

PANELLA, J.

¶ 1 Appellant Shawn Reed appeals from the judgment of sentence imposed by the Honorable David L. Ashworth on May 6, 2003. Following a non-jury trial, Appellant was found guilty of obstructing administration of law or other governmental function [1] and sentenced to time served to twelve months plus costs. Appellant filed a timely notice of appeal on June 4, 2003.

¶ 2 Appellant raises two issues on appeal. First, Appellant argues that his conviction is in direct violation of his federal and state guarantees of freedom from unreasonable searches. Second, Appellant contends that the trial court's finding of

---

1.  18 Pa.Cons.Stat.Ann. § 5101

intent is not based upon competent evidence of record. Because of the import of the constitutional issues that have been raised, we will address each issue fully *seriatim.*

¶ 3 The facts involved in this case are essentially undisputed. On November 16, 2002, Officer Bret McFarland of the Lancaster City Bureau of Police received a call from Lancaster County Communications at approximately 2:06 a.m. N.T., 5/6/2003 at 9–10. The call center informed McFarland of a tip received from Connie McMullen in New Jersey regarding the possible location of her runaway stepdaughter. *Id.* at 10. Ms. McMullen believed that her stepdaughter, Nicole McMullen, was residing with her aunt, Bernice McMullen, at 58 North Prince Street in the second floor apartment. *Id.* Officer McFarland was given a description of Nicole and then proceeded to 58 North Prince Street. N.T., 5/6/2003 at 11.

¶ 4 Officer McFarland arrived at 58 North Prince Street at approximately 2:15 a.m. and observed a woman waiting at the outside door to the building. *Id.* The door was locked from the inside and required the assistance of a resident to open. *Id.* at 12. Officer McFarland learned that the woman was there to visit with a resident of the third floor and was waiting for him to come down and open the door. *Id.* at 11.

¶ 5 Shortly after Officer McFarland's arrival, Appellant walked down the stairs and opened the outside door. *Id.* at 12. Officer McFarland confirmed that Appellant was the third floor resident and proceeded to force his way into the building. *Id.* at 13. Appellant blocked Officer McFarland's entrance and asked the officer if he had a warrant. *Id.* Appellant further questioned Officer McFarland regarding his purpose at the building. *Id.* Officer McFarland responded that it was none of Appellant's business why he was

there and said "just let me get by and do my job". *Id.* at 15.

¶ 6 Appellant continued to impede Officer McFarland's progress into the building and up the stairs to the second floor. *Id.* at 13. While ascending the stairs, Appellant leaned his weight on Officer McFarland. *Id.* at 38. McFarland "walked" Appellant up the stairs chest-to-chest with McFarland's arm creating space between them. *Id.* at 39. Once they reached the second floor landing, Officer McFarland pushed Appellant who responded by pushing back at the officer. *Id.* at 37. At this point, Officer McFarland decided to arrest Appellant with the intention of charging him with disorderly conduct. *Id.* at 42. After consulting with his sergeant, however, Officer McFarland decided to charge Appellant with obstructing administration of law. *Id.*

■ ¶ 7 Appellant first contends that he cannot be convicted of obstructing administration of law as Officer McFarland was engaged in an illegal search at the time. Appellant argues that the Federal and Pennsylvania Constitutions' protections from unreasonable searches gave him the right to block McFarland's entry into the building. The primary purpose of both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution is to "protect citizens from unreasonable searches and seizures." *In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161, 1163 (2001). Furthermore, the right to exclude evidence pursuant to Article I, Section 8 of the Pennsylvania Constitution is more expansive than the right granted by the Fourth Amendment. *Commonwealth v. Valentin,* 748 A.2d 711, 713 (Pa.Super.), *appeal denied,* 564 Pa. 731, 766 A.2d 1247 (2000).

■ ¶ 8 To determine whether an area is protected from searches, we analyze

whether the person asserting the right had a legitimate expectation of privacy in the area. *Commonwealth v. Ferretti,* 395 Pa.Super. 629, 577 A.2d 1375, 1379 (1990). (citation omitted). This determination is to be accomplished by an examination of the totality of the circumstances. *Id.* In support of his argument that he was privileged to obstruct Officer McFarland's entry under the United States Constitution, Appellant cites to *U.S. v. Carriger,* 541 F.2d 545 (6th Cir.1976).

¶ 9 In *Carriger,* the Sixth Circuit ruled that tenants have a protected privacy interest in common areas that are accessible only through a locked entrance. Specifically, the court held "[t]he officer's entry into this locked apartment building without permission and without a warrant of any kind was an illegal entry and violated appellant's Fourth Amendment rights." *Carriger,* 541 F.2d at 550. *Carriger* continues as valid precedent in the Sixth Circuit. *See U.S. v. Heath,* 259 F.3d 522 (6th Cir.2001). The Ninth Circuit has reached a similar conclusion on this issue. *See U.S. v. Fluker,* 543 F.2d 709 (9th Cir.1976).

¶ 10 However, the Third Circuit has expressly rejected *Carriger* and *Fluker.* In *U.S. v. Acosta,* 965 F.2d 1248, 1252 (3rd Cir.1992), the Third Circuit addressed the issue of a tenant's protected privacy interest in the common areas of an apartment building. The Third Circuit was faced with a record that indicated the common area in question "was easily accessible to tenants, visitors, solicitors, workmen, and other members of the public." *Acosta,* 965 F.2d at 1252. When it began its analysis of this factual scenario, the Third Circuit first examined the rule in the Second Circuit as set forth in *U.S. v. Holland,* 755 F.2d 253 (2d. Cir.1985), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985).

¶ 11 The defendant in *Holland* was arrested when he opened the outside door to a hallway shared with other apartments in the building. The Second Circuit held that the arrest did not occur within the defendant's protected zone of privacy, pursuant to three separate rationales. First, the Supreme Court cases which define the area protected from unreasonable searches consistently refer to invasions of living quarters. Second, pursuant to *Katz v. U.S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court reasoned that only when a defendant has the ability and right to exclude others from entrance to an internal area would a reasonable expectation of privacy arise. Finally, the court opined that a rule that extended an individual's zone of privacy to common areas would prevent police from protecting the tenants' actual residences. *Holland,* 755 F.2d at 255–256.

¶ 12 The *Acosta* court found itself "in agreement with the Second Circuit's analysis in *Holland* as applied to the facts [before it]". *Acosta,* 965 F.2d, at 1252. The Third Circuit recognized that two circuits had held that common areas were protected. *Acosta,* 965 F.2d at 1252 (citing *Carriger, supra,* and *Fluker, supra* ). However, the *Acosta* court found the Second Circuit's analysis in *Holland* most persuasive. As a result, the court held that "[o]n this record, defendants had no way to exclude anyone and, therefore, could not have reasonably expected their privacy to extend beyond their apartment door." *Id.* (citations omitted).

¶ 13 A similar conclusion was reached by this Court independently in *Commonwealth v. Thomas,* 698 A.2d 85 (Pa.Super.1997). In *Thomas,* a police officer used a fire escape to gain access to the rooftop of a building. On the roof was a free-standing apartment as well as a small garden. The officer observed marijuana

plants in the garden and charged the occupant of the rooftop apartment with manufacture and possession of a controlled sub-stance.

¶ 14 In *Thomas* the defendant argued that the officer's use of the fire escape violated his Fourth Amendment right against unreasonable searches. This Court, on appeal, affirmed the judgment of sentence, holding that a fire escape utilized by several apartments was not an area protected from unreasonable searches and seizures.

¶ 15 Appellant attempts to distinguish *Thomas* by arguing that "[a]ccess to the fire escape was not limited to the tenants of the building, however, as the fire escape was unlocked and open to the public." Appellant's Brief at 11. However, this Court specifically stated in *Thomas* that "the suppression court judge's finding that the fire escape was used on a daily basis for ingress and egress is not supported by the record." Although the record did not support a finding that the fire escape was routinely used by other tenants, we emphasized that the fire escape was an emergency route open to all occupants of the building: "the officer did not stray from the path that the residents of appellant's apartment or the adjacent building would have taken during an emergency." *Thomas,* 698 A.2d at 86. Accordingly, we read the *Thomas* opinion to hold that an area that was not routinely used by other tenants, but could have been used in an emergency by the tenants, was not protected.

¶ 16 The crucial distinction between protected and unprotected areas, as set forth in the above cited cases, is whether an unrelated person has unfettered access to the area.[2] If even one unrelated person has an unfettered right to access an area, the area is not protected in Pennsylvania from government searches and seizures.[3] While we recognize that some foreign jurisdictions do not agree with this conclusion, it is clearly in line with the Third Circuit and Pennsylvania case law on the issue.

¶ 17 As applied to the instant case, the record establishes that Appellant did not have the right to exclude the residents of the second floor apartments from the hallway or stairs. The hallway and stairs in the apartment building which Appellant asserts a privilege to exclude a police officer may, at the very least, be used by the other residents of the building in an emergency. Charles Murray, the landlord of the building testified that each resident had a key to the door that accessed this hallway and staircase. Under these circumstances, Appellant had no legitimate expectation of privacy in the hallway or stairs, and therefore had no right to exclude the other residents of the building, nor their invited guests, from the hallway and stairs. Since no evidence was provided that the other residents were in any way related to Appellant, Appellant had no reasonable expectation of privacy in these common areas under the law. Accordingly, neither the United States Constitution

2. Clearly, the free access of family members or intimate partners does not vitiate a person's expectation of privacy in an otherwise exclusive area. Furthermore, landlords occupy a unique position in this analysis owing to their common ownership interest in the area leased to the tenant. Therefore, the unfettered right of access of a landlord, or a landlord's agents to a tenant's apartment is not controlling on this issue.

3. No inference that Reed attempted to keep anything in the hallway or staircase as private from the other unrelated persons living in the building can be drawn from these facts. Therefore, *Katz v. U.S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) *does not counsel* for a different result.

nor Pennsylvania law bars Appellant's conviction for obstructing the administration of law.

¶ 18 In his second issue on appeal, Appellant argues that there is insufficient evidence of record to establish that he had the intent required for a conviction of obstruction of the administration of law. The trial court, in its Opinion dated July 18, 2003 states "Officer McFarland was in full uniform, so there was no confusion about his authority." Trial Court Opinion, July 18, 2003 at 2. Furthermore, the trial court states that "There is no requirement that an officer inform curious citizens as to his or her intent when conducting official police business." Trial Court Opinion, July 18, 2003 at 4.

¶ 19 "When reviewing a sufficiency of the evidence claim, an appellate court must view all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as the verdict winner and must determine whether the evidence was such as to enable a fact finder to find that all of the elements of the offense[ ] were established beyond a reasonable doubt." *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1132 (1996) (citation omitted). In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. *Commonwealth v. Repko*, 817 A.2d 549, 553 (Pa.Super.2003). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Id.* (citations omitted). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial

evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Id.* (citations and quotation marks omitted).

¶ 20 Initially, we must address the trial court's finding that since Officer McFarland was in uniform, Appellant could not have been confused about Officer McFarland's authority. We conclude that this presumption is too broad.

■ ¶ 21 It is well established that a citizen need not respond to every statement or question uttered by a police officer in uniform. *See Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884 (2000). In fact, we doubt even the Commonwealth would advocate a bright line test that would declare that all actions taken by a uniformed officer, no matter how egregious, are done with the express authority of the Commonwealth. However, if a uniformed officer states that he is acting pursuant to police authority, a citizen must accept this as true at the time, or face the possibility of prosecution. *See Commonwealth v. Biagini*, 540 Pa. 22, 655 A.2d 492 (1995) (no right to resist an arrest even if defendant believed arrest was unlawful).

¶ 22 The trial court, in its opinion, opines that requiring an officer to state the nature of his business would be detrimental to law enforcement. However, we fail to see how cautionary words that the officer is on official business would have any detrimental effect. A comment identifying official business reveals nothing about the specific business at hand, and serves to notify the public that interfering with the officer will be interference with the administration of law.

■ ¶ 23 In the present case, Officer McFarland did not state that he was on official business when questioned by Appellant. However, at some point Officer McFarland did state "just let me get by and *do my job*". (N.T., 5/6/03, at 15) (emphasis added). While not the clearest expression of his authority, Officer McFarland's statement was sufficient to inform Appellant that he was engaged in performing official police duties. At that point, Appellant was put on notice that Officer McFarland was engaged in the exercise of his duties and any interference with the officer would be interference with the administration of law. Accordingly, the fact that Appellant continued to impede Officer McFarland's movement after Officer McFarland made this statement is a sufficient basis for the trial court to find intent.

¶ 24 Judgment of sentence is affirmed.

¶ 25 Judge OLSZEWSKI files a Concurring Opinion.

OLSZEWSKI, J., Concurring.

¶ 1 In this difficult case, I agree with the result reached by the majority. Appellant did not have a legitimate expectation of privacy in the entryway or stairwell of his apartment building. Therefore, he did not have the right to actively obstruct Officer McFarland's progress while the officer was engaged in legitimate police business.[4] Yet, I must differ with *how* the majority comes to find that appellant had no legitimate expectation of privacy in this area.

¶ 2 As the majority states:

The crucial distinction between protected and unprotected areas, as set forth in the above cited cases, is whether an unrelated person has unfettered access to the area. If even one unrelated person has an unfettered right to access an area, the area is not protected in Pennsylvania from government searches and seizures.

Majority Opinion at 962.

¶ 3 It is true that in circumstances similar to the one before us, both the Eight and Ninth Circuit Court of Appeals have declared "[a]n expectation of privacy necessarily implies an expectation that one will be free of *any* intrusion, not merely unwarranted intrusions." *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir.1993). It is also true, however, that these statements are not at all consis-

4. Appellant was convicted of violating 18 Pa. C.S. § 5101. This section states:
   § 5101. Obstructing administration of law or other governmental function
   A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other govern-mental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with the law without affirmative interference with governmental functions.
   Like the majority, I believe that if appellant had a legitimate expectation of privacy in the entryway and stairwell of his apartment building, his action of standing in the officer's way—even to the point where the officer walked him chest-to-chest up the stairs—would not have been unlawful. If he did have a legitimate expectation of privacy in these areas, his non-violent physical interference could not amount to obstruction of justice; he simply would have been protecting, in a non-violent manner, what is at the "very core" of the Fourth Amendment: the right to "be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The broad language of 18 Pa.C.S. § 5101 cannot be read to subvert one of the keystones of our society.

tent with the precedent set down by the United States Supreme Court.

¶ 4 First, and most noticeably, there is *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). In *Stoner*, the police suspected that an armed robbery suspect was staying at a certain hotel. Upon arriving at the hotel, the night desk clerk informed the police that the suspect was indeed staying there, but that he had temporarily gone out. The reason why the clerk knew that Stoner was not in his room was because all hotel guests had to give the desk clerk their room key before leaving the hotel. The police then asked the clerk whether he would unlock the hotel room door and allow them to enter. The clerk complied. After entering the room, the police proceeded to thoroughly search and inventory the contents of the room, doing so without either a search or arrest warrant. The search turned up several pieces of incriminating evidence, all of which were introduced at trial and which led to Stoner's conviction. Stoner appealed to the Supreme Court, arguing that the warrantless police search of his room violated his Fourth Amendment rights.

¶ 5 Had the Supreme Court said "[t]he crucial distinction between protected and unprotected areas...is whether an unrelated person has unfettered access to the area," Mr. Stoner probably would not have stood a chance. Not only did he surrender his room key to the front desk clerk, but, as the Supreme Court recognized, by staying in a hotel Mr. Stoner "undoubtedly [gave] 'implied or express permission' to 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties.'" *Id.* at 489, 84 S.Ct. 889

(*quoting from United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951)). These facts, however, did not stop the Court from finding that Mr. Stoner had a constitutional right to be free from governmental intrusion in his hotel room.

¶ 6 In holding as it did, the Supreme Court showed that what mattered was the violation, by government hands, of Mr. Stoner's *privacy* interest. Importantly, this privacy interest survived even though other "unrelated" individuals had "unfettered access" to Mr. Stoner's hotel room. This was made clear in *Mancusi v. DeForte*,[5] 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

¶ 7 In *DeForte*, the government was investigating Frank DeForte, a union official, for various offenses. Without a warrant and over the objections of DeForte, government officials entered and searched the office in which Mr. DeForte worked; they then seized books and records that belonged to the union and used these papers to prosecute Mr. DeForte. This office, the Supreme Court explained, was "one large room, which [Mr. DeForte] shared with several other union officials." *Id.* at 368, 88 S.Ct. 2120. Further, Mr. DeForte never claimed that any part of the office was "reserved for his exclusive personal use." *Id.* With these specifics in mind, the Court had to determine "whether, in light of all the circumstances, DeForte's office...was one in which there was a reasonable expectation of freedom from governmental intrusion." *Id.*

¶ 8 As Justice Harlan stated, the fact that other union officials and their invitees

---

5. Although *DeForte* was decided the year after *Katz* and the language the *DeForte* Court uses does resemble that used in *Katz*, *DeForte* did not (at least explicitly) apply the *Katz* balancing test. *DeForte* was a *habeas* proceeding. As the Supreme Court explained in *Desist v.*

*United States*, since *Katz* made a "clear break with the past," *Katz's* application was limited to searches conducted after the decision was handed down. 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

could enter the office did not "fundamentally change[ ]...the situation." *Id.* at 369, 88 S.Ct. 2120. In other words, even though Mr. DeForte could not stop his office mates or the various people they brought into the office from entering, it did not vitiate the privacy interest he had in his office. What mattered to the Court was that "DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." *Id.* The Court then held that Mr. DeForte had a reasonable expectation of privacy in the office.

¶ 9 In the post-*Katz* era, *Stoner* and *DeForte* continue to be good law—this is made apparent by *O'Connor v. Ortega,* which asked whether a public employee had a reasonable expectation of privacy in his "office, desk, and file cabinets at his place of work." 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Here, management at a California-operated hospital believed that one of their doctors, Dr. Magno Ortega, had committed various offenses while at work. In order to facilitate the hospital's investigation, Dr. Ortega was placed on administrative leave and asked to stay off hospital grounds while the investigation was ongoing. State employees then thoroughly searched Dr. Ortega's office, looking through his desk and file cabinets and inventorying the official, as well as personal, effects they found. Some of the items the investigators found were then used against the doctor in administrative disciplinary proceedings, eventually resulting in the termination of his employment. Dr. Ortega commenced action under 42 U.S.C. § 1983 and alleged that the search of his office violated his Fourth Amendment rights.

¶ 10 This case revolved around whether the hospital officials infringed an "expectation of privacy that society is prepared to consider reasonable": an extremely fact-specific determination. *Id.* at 715, 107 S.Ct. 1492. Everything depends on "context" and, in this case, the "employee's expectation of privacy must be assessed in the context of the employment relation." *Id.* As Justice O'Connor explained:

An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office.

*Id.* at 717, 107 S.Ct. 1492.

¶ 11 These factors, however, do not automatically show that the employee has no legitimate expectation of privacy in their office. While the majority recognized that "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable", every situation must be "addressed on a case-by-case basis." *Id.* at 718, 107 S.Ct. 1492. Here, the district court never determined the "extent to which Hospital officials may have had work-related reasons to enter Dr. Ortega's office"; the Supreme Court thus remanded the case in order to determine whether Dr. Ortega's expectation of privacy in his office was reasonable. *Id.* With respect to his desk and file cabinets, however, the Court had a much easier job; as the Court stated: the "undisputed evidence discloses that Dr. Ortega did not share his desk or file cabinets with any other employees"; apparently, the only

materials he kept in these areas were private and those private effects were the only things the state seized for use in the administrative hearings. Dr. Ortega thus had a reasonable expectation of privacy within his desk and file cabinets. *Id.*

¶ 12 The above review shows that it cannot be the law that "if even one unrelated person has an unfettered right to access an area, the area is not protected in Pennsylvania from government searches and seizures." Determining whether an individual has a reasonable expectation of privacy in a certain area is just not that simple. Rather, we must look at all of the facts surrounding the controversy before we can say whether an individual's expectation of privacy is reasonable.

¶ 13 Viewing everything in context, I believe that even if it could be said that Mr. Reed had a subjective expectation of privacy in the entryway and stairwell of his apartment building, that expectation was not reasonable. First, friends, relatives, acquaintances, and delivery persons of every tenant in the building may legitimately pass through the entryway and traverse the stairwell; Mr. Reed has no ability to exclude any of these people. Second, both areas are merely places of ingress and egress and do not lead into any dwelling. Third, and in following with the preceding point, these are not sleeping places nor are they areas in which personal effects are placed.

¶ 14 Mr. Reed argues that the door is locked for a reason: to provide some solace from the outside world. While I disagree with the Eighth Circuit's overly broad statement of the law concerning when individuals have a reasonable expectation of privacy, I believe that the court hit the nail on the head when it declared that the "locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways." *Eisler,* 567 F.2d at 816. Security is different from privacy. While Mr. Reed has the ability to call the police and have a trespasser removed from the common areas, it is not because that person invaded Mr. Reed's privacy interest. Rather, principles of property and criminal law intersect to exclude this individual from the premises. Principles of property law do not carry the day anymore when we examine the reasonableness of an individual's expectation of privacy.

¶ 15 Viewing the facts in their totality, the inevitable conclusion is that the entryway and stairwell of Mr. Reed's apartment building are areas which are simply too "open to fellow [tenants] or the public that no expectation of privacy is reasonable." *O'Connor,* 480 U.S. at 718, 107 S.Ct. 1492. As appellant had no reasonable expectation of privacy in the entryway or stairwell of his apartment building, he had no right to intentionally and actively obstruct Officer McFarland while the officer was engaged in legitimate police business. I thus concur in the result reached by the able majority.