J-S28035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| EMILY SUE BLEILER | : | |
| | : | |
| Appellant | : | No. 432 MDA 2022 |

Appeal from the Judgment of Sentence Entered February 9, 2022
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0002085-2021

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: DECEMBER 9, 2022**

Appellant, Emily Sue Bleiler, appeals from the judgment of sentence entered in the Berks County Court of Common Pleas, following her bench trial conviction for obstructing administration of law or other governmental function.[1] We affirm.

The relevant facts and procedural history of this case are as follows. On July 12, 2021, the Commonwealth charged Appellant with interference with custody of children, concealment of the whereabouts of a child, and obstructing administration of law or other governmental function. Appellant proceeded to a bench trial on February 2, 2022.

The Commonwealth presented the following testimony/evidence at trial.

---

[1] 18 Pa.C.S.A. § 5101.

Hope Yacobowsky testified that in the early morning hours of February 1, 2021 (when she was 17 years old), she texted her ex-boyfriend, Mark Jones, about a fight she had with her parents. Hope asked Mark to pick her up, and Mark arrived at her home with his uncle, Justin Jones. By the time they arrived, Hope indicated that things had resolved with her parents, and she wanted to stay at her house. Mark told her if she did not go with him, she would regret it. Based on Mark's prior actions during their dating relationship, Hope took the threat seriously. Hope left the house to go with Mark and Justin without telling her parents she was leaving or where she was going. Mark and Justin brought Hope to Justin's home, where she stayed until February 2, 2021. During that time, Hope repeatedly told Mark and Justin that she wanted to go home, but they would not let her go.

Hope next went to the home of Mark's half-sister, Appellant. Hope knew Appellant from previous interactions when she was dating Mark. Hope told Appellant multiple times that she wanted to go home, but Appellant said she could not. While staying at Appellant's house, Hope developed a urinary tract infection and pleaded to go home because she was in pain. Both Mark and Appellant told Hope she could not leave. After spending the night on February 2, 2021 at Appellant's house, Appellant and her boyfriend, Steven Freeman, brought Hope to Walmart to purchase medication to treat her infection. Hope had no money, so Appellant and Steven purchased the medication. Appellant and Steven also bought hair dye, and they told Hope she needed to dye her

hair so no one would recognize her. After leaving Walmart, Appellant and Steven drove with Hope to the liquor store and then to "their dealer's house" to purchase marijuana. They then went back to Appellant's house to wait for a text from Mark, who had indicated that he would need a ride. Once Mark texted, Steven, Appellant, and Hope drove to pick up Mark. After picking up Mark, they returned to Appellant's house, where they all began to drink and smoke marijuana. Hope testified she felt pressured to drink and smoke because Mark used to yell at her or hit her if she did not engage in those types of activities with Mark and his friends. Prior to, and while they were all drinking and smoking, Hope told Appellant she wanted to go home. Upon Mark's direction, Hope also sent money to Appellant via "Cash App," so that Appellant could then give Hope money without her parents being able to trace an ATM withdrawal. Mark also told Hope that if she dialed 911 or attempted to leave that he would come after her. Based on prior threats, Hope took Mark's statements seriously.

The next morning on February 4, 2021, Hope woke up and heard Appellant and Steven talking. Hope overheard Steven say there was a cop at the front door. After the police officer showed up, Mark directed Hope to run upstairs. Hope heard the police officer yell, "I'm not playing. I'm not messing with you guys. Just bring her downstairs." At that point, Hope went downstairs. The officer transported Hope to her parents' house. (*See* N.T. Trial, 2/2/22, at 6-60).

Paul Yacobowsky, Hope's father, testified that in the late hours of January 31, 2021, Hope and Paul's wife, Tammy, had an argument over Hope's contact with Mark. Paul and Tammy believed Mark was a "bad apple," and disapproved of them spending time together. Paul believed things were okay after the argument and that Hope went upstairs to bed. During the early morning hours of February 1, 2021, Paul noticed that Hope was missing from the house. Paul called the police. Paul also called Justin because Paul knew Justin had a car and suspected that Hope was with Mark. Justin answered the phone, denied having seen Hope, passed the phone to Mark, and Mark also denied having seen Hope. Mark also told Paul that Hope said she was going to stay with some friends in Pottsville or Pottstown.

Later that morning, Paul reached out to Appellant via Facebook Messenger looking for Hope. Appellant said she had not seen Hope, that she would keep Hope in her prayers, and confirmed what Mark said about Hope staying in Pottsville or Pottstown. Paul reiterated to Appellant that Hope was only 17 years old. At some point, Paul received a notification about a banking transaction from Hope to Appellant. Paul and Hope share a joint account, so Paul had access to the account. After Paul knew about the banking transaction, he did not contact Appellant again but gave that information to police. However, Appellant reached out to Paul, asking if there was any update on Hope's whereabouts. Paul informed Appellant that the police were investigating the matter. (*Id.* at 61-81).

- 4 -

Detective Christopher Stouch[2] testified that his department received a call at 1:34 a.m. on February 1, 2021, from Paul regarding his missing daughter, Hope. On February 4, 2021, based on the banking transaction information, Detective Stouch went to Appellant's address. The curtains were closed, and there were two vehicles in the driveway. Detective Stouch parked his vehicle up the road and observed the house. About 20 minutes later, Detective Stouch saw the front door open, and a dog ran outside. Detective Stouch approached the house and could see inside the glass storm door. He also heard someone yell something and people run across the room.

As the detective approached, Appellant came to the door and tried to shut it, presumably to block the detective's view inside. The detective was not in full uniform, but he was wearing a badge and gun on his belt, and he had an embroidered gold police badge on his shirt. The detective knocked on the door and said he was looking for Hope. Appellant said Hope was not there. Detective Stouch believed Hope was inside the house, so he yelled out, "listen, I'm not playing around." Shortly thereafter, Hope came outside, and the detective transported her home to her parents. (*Id.* at 82-92).

The defense first called Appellant's boyfriend, Steven Freeman. Steven testified that when Hope arrived at his house (where Appellant also lives),

---

[2] At the time of trial, Detective Stouch had been promoted to Chief. As the notes of testimony refer to him as "Detective Stouch," we will continue with that designation.

Hope told Steven she had a fight with her parents and wanted to spend some time there to cool down. Steven observed scratches on Hope's neck, which Hope said were from her parents. Hope said she was scared to return home and did not indicate that she wanted to go home at any point. When the detective arrived on February 4, 2021, Steven did not know it was the police at first because he only saw a black SUV. Steven confirmed that he was the person who had closed the door because he did not know who was outside and because the cat sometimes gets out through the storm door. Once they knew it was a police officer looking for Hope, Mark told the officer that Hope was not there and Appellant said to Mark, "fix this;" then, Hope came downstairs. After she had returned home, Hope reached out to Mark, Steven, and Appellant to see if they were all okay. (*Id.* at 100-112).

Frank Bleiler, Appellant's father, testified that he lives with Appellant, Steven, and Frank's other children. When Hope arrived at his home, she showed Frank a red mark on her neck that she said was from her father, and Hope said she did not feel safe going home. Other than that initial interaction, Frank had no conversations with Hope. (*Id.* at 113-122). After Frank's testimony, the defense rested.

The Commonwealth then recalled Detective Stouch for rebuttal. The detective clarified that Appellant had her hand on the door when it was closing. The detective said it was possible that Steven was behind the door and pushing it shut. Detective Stouch confirmed that he looked at Appellant,

identified himself, and asked Appellant if Hope was inside the house. Appellant said "no, she's not here." Steven was also there during the conversation. The detective did not hear Appellant say, "fix this." After the detective yelled inside the house, Hope came out. (*Id.* at 126-131).

Following trial, the court convicted Appellant of obstructing administration of law or other governmental function. The court found Appellant not guilty of the other offenses. On February 9, 2022, the court sentenced Appellant to 18 months' probation. Appellant timely filed a notice of appeal on March 8, 2022. The next day, Appellant filed a motion to stay the sentence pending appeal, which the trial court denied. On March 16, 2022, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied on March 24, 2022.

Appellant raises one issue for our review:

> Whether there was sufficient evidence to sustain the conviction on the charge of obstruction of the administration of law or other governmental function where the Commonwealth failed to present any evidence that Appellant's actions in closing the door on the police officer actually obstructed, impaired, or perverted the administration of law or government as the officer had no lawful right to enter the home and, moreover, the teenager in question was recovered shortly thereafter by the officer simply calling out to the teenager to exit the home?

(Appellant's Brief at 4).

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

- 7 -

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa.Super. 2019) (quoting *Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

Appellant argues the Commonwealth failed to establish that her act of closing the door on a police officer obstructed, impaired, or perverted the administration of law or government functions. Appellant asserts the detective had no lawful right to enter her home. Appellant emphasizes that the detective recovered the missing teenager shortly after the alleged obstruction by simply calling out to the teenager to exit the home. Appellant

- 8 -

insists the detective was not in uniform when he arrived at her home, and he did not announce his identity until after Appellant had closed the door on him. Appellant contends she had no legal duty to keep her door open, and she was within her rights to close the door on the detective where he did not have a search or arrest warrant.[3] Appellant further maintains her statement that the teenager was not inside the home did not constitute an obstacle sufficient to support her conviction. Appellant concludes the Commonwealth presented insufficient evidence to sustain her conviction, and this Court must reverse her conviction and vacate the judgment of sentence. We disagree.

The Crimes Code defines the offense of obstructing administration of law or other governmental function as follows:

> **§ 5101. Obstructing administration of law or other governmental function**
>
> A person commits a misdemeanor of the second degree if [s]he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S.A. § 5101.

---

[3] Although Appellant makes much of the fact that Detective Stouch did not have a search warrant or an arrest warrant, we emphasize that the detective did not enter Appellant's home or place anyone under arrest during the interaction at issue.

The crime consists of two elements: 1) an intent to obstruct the administration of law; and 2) an act of "affirmative interference with governmental functions." *Commonwealth v. Gentile*, 640 A.2d 1309, 1312 (Pa.Super. 1994) (internal citation and quotation marks omitted). This offense was derived from Section 242.1 of the Model Penal Code, which was "designed to cover a broad range of behavior that impedes or defeats the operation of government." *Commonwealth v. Palchanes*, 224 A.3d 58, 60 (Pa.Super. 2019), *appeal denied*, 659 Pa. 354, 232 A.3d 566 (2020). Notably, "[t]he interference need not involve physical contact with the government official as he performs his duties." *Commonwealth v. Johnson*, 100 A.3d 207, 215 (Pa.Super. 2014), *appeal denied*, 631 Pa. 725 (2015). *See also Commonwealth v. Mastrangelo*, 489 Pa. 254, 414 A.2d 54 (1980) (affirming conviction under Section 5101 based on defendant's verbal abuse of parking enforcement officer upon receiving parking ticket, which ultimately deterred officer from performing her job).

This Court has explained:

> Evidence that one has physically impeded a law enforcement officer from administering the law has been held sufficient to sustain a conviction under § 5101. *See Commonwealth v. Conception*, 657 A.2d 1298 ([Pa. Super.] 1995) (appellant blocked door of her apartment to prevent the police from entering to apprehend fugitive who was hiding in the shower stall); *Commonwealth v. Reed*, 851 A.2d 958, 963-64 (Pa.Super. 2004) (defendant attempted to obstruct the pathway of a uniformed police officer in the common area of an apartment house after the officer exclaimed to the defendant: "Just let me get by and do my job"); *Commonwealth v. Love*, 896 A.2d 1276,

- 10 -

1284-[85] (Pa.Super. 2006) (defendant, in an attempt to interfere with the law enforcement officer who was escorting his wife from the courtroom, placed his arm across the court officer's chest and attempted to push him).

***Johnson, supra*** at 214-15 (holding evidence was sufficient to sustain conviction under Section 5101 where appellant intentionally delayed opening locked door to announced police presence to permit suspect to escape apprehension). Moreover, "[S]ection 5101 includes intentional, albeit unsuccessful attempts to influence, obstruct, or delay the administration of law." ***Commonwealth v. Snyder***, 60 A.3d 165, 177 (Pa.Super. 2013), *appeal denied*, 620 Pa. 731, 70 A.3d 811 (2013) (quoting ***Commonwealth v. Trolene***, 397 A.2d 1200, 1204 (Pa.Super. 1979)).

Instantly, the trial court reasoned:

[T]he Commonwealth presented testimony from Detective Christopher Stouch that while in his attempt to check for the missing teenager at [Appellant's] home in Bernville, he approached the glass storm door of the house. He was in an unmarked police vehicle but was wearing a polo with a gold police badge embroidered on the chest and had his badge and gun on his waist. At the front door, he heard yelling and observed people running when [Appellant] appeared at the glass storm door and someone in the house shut the front door. He informed [Appellant] he was looking for the missing teenager and [Appellant] answered that she was not there through the closed door. The detective continued the conversation through the door and yelled out for the missing teenager to come out of the house. Minutes later, the teenager appeared and exited the house. There was conflicting testimony [about] whether [Appellant] closed the door or someone else in the house closed the door. Although [Appellant] may not have been the one to actually close the door on the officer, she did obstruct the officer's investigation by telling him the missing teenager was not there, when in fact, she was at the house. This is

- 11 -

clearly enough to show that [Appellant] intentionally obstructed, impaired or perverted the administration of law function by physical interference or obstacle.

This [c]ourt finds that the evidence was sufficient to have permitted the trier of fact to find that each and every element of the [crime] charged was established beyond a reasonable doubt[.]

(Trial Court Opinion, filed 3/31/22, at 4-5). The record supports the court's analysis.

Here, the Commonwealth presented evidence that Appellant knew of Hope's whereabouts but denied such knowledge to Hope's father. Appellant told Hope's father that Hope was in Pottsville or Pottstown to throw him off track. Once Hope was staying at Appellant's house, Appellant reached out to Hope's father to ask if there were any updates on Hope, in another attempt to throw Hope's parents off track. When Hope's father informed Appellant that police were investigating the matter, Appellant did not admit that Hope was in her home.

At the time Detective Stouch arrived at Appellant's home, she either closed the door as the detective was approaching or stood next to Steven while he was pushing the door closed. When the detective identified himself and said he was looking for Hope who was a missing juvenile, Appellant stated Hope was not there. Such conduct amounted to a clear attempt to turn the detective away. The detective's experience led him to believe that Hope was inside the house, so notwithstanding Appellant's statement, the detective yelled out for Hope. Ultimately, Hope came outside.

On this record, the evidence demonstrates that Appellant, by her words and/or actions, intended to obstruct or delay the administration of law. Appellant also took affirmative steps to do so by closing the door on the detective and giving the detective false information that Hope was not inside the house. *See* 18 Pa.C.S.A. § 5101; ***Johnson, supra***; ***Snyder, supra***; ***Gentile, supra***. Viewed in the light most favorable to the Commonwealth as verdict-winner, the evidence was sufficient to sustain Appellant's conviction. *See Sebolka, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judge Olson joins this memorandum.

Judge McLaughlin files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/2022